1  **JANET C. TUNG**
California State Bar No. 231682
2  **FEDERAL DEFENDERS OF SAN DIEGO, INC**.
225 Broadway, Suite 900
3  San Diego, CA 92101-5008
Telephone: (619) 234-8467
4  Janet_Tung@fd.org

5  Attorneys for VITALIY KAGANOVICH

6

7

8                    UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10                  **(HONORABLE IRMA E. GONZALES)**

11  VITALIY KAGANOVICH,                ) CASE No. 07-CV-02403-JAH (AJB)
                                        )
12              Petitioner,             )
                                        )
13  v.                                  ) PETITIONER'S TRAVERSE
                                        )
14  MICHAEL CHERTOFF, et al.,           )
                                        )
15              Respondents.            )
    _____ )

16

17                        **INTRODUCTION**

18        Mr. Kaganovich has been indefinitely detained in immigration custody, with no prospect for

19  removal, since February 8, 2007—*for over one year*, more than twice the amount of time authorized by the

20  Supreme Court in Zadvydas v. Davis, 533 U.S. 678 (2001). It is undisputed that Mr. Kaganovich's removal

21  order was final since at least February 5, 2007. Respondents have had, under any calculation, between seven

22  and a half (7.5) and thirteen (13) months to effect Mr. Kaganovich's removal. They have made no headway

23  at all.

24        This is a simple case. The parties agree on every relevant point of fact; the only dispute that

25  remains is whether Respondents have detained Mr. Kaganovich for one and a half (1.5) or seven (7) months

26  too many. The case is directly controlled by the Supreme Court's opinion in Zadvydas. The government

27  concedes that it has detained Mr. Kaganovich beyond the six-month period deemed presumptively

28  reasonable by Zadvydas. The government concedes that it has had since at least July 20, 2007, to obtain

1   travel documents. Id. at 3. Most importantly, the government has candidly admitted to the Court that it has

2   made no progress at all obtaining travel documents for Mr. Kaganovich "due to communication problems

3   with the Ukraine consulate." See Return at 4. Thus, despite Mr. Kaganovich's undisputed full cooperation

4   with the government's efforts to obtain travel documents, removal is no more likely now than it was thirteen

5   months ago because, according to Repondents's own evidence, the Ukrainian consulate has refused to

6   process the request—a factor entirely beyond the control of Mr. Kaganovich, and, indeed, beyond the ability

7   of Respondents' best efforts to secure travel documents.

8       The law and facts line up so firmly in favor of relief that Respondents' decision to oppose

9   actively Mr. Kaganovich's habeas petition is surprising. Should things continue to progress at their current

10  zero rate of speed, established by the government's own evidence, it will never obtain the travel documents

11  necessary to effect removal. Mr. Kaganovich has languished in unlawful detention for too long. Zadvydas

12  commands his release.

13                      **FACTUAL AND PROCEDURAL BACKGROUND**[1]

14      The salient facts in this case are not in dispute. Mr. Kaganovich was lawfully admitted to the

15  United States in 1995 as a permanent resident. See Pet. at 2. He lost his permanent resident status on

16  December 12, 2006, when his order of removal became final upon the Ninth Circuit's denial of his petition

17  of review. See Pet. at 2-3 (describing removal proceedings). The stay of removal that had been in place

18  while the Ninth Circuit considered Mr. Kaganovich's case dissolved upon issuance of the mandate on

19  February 5, 2007.

20      Respondents took Mr. Kaganovich into custody on February 8, 2007—over thirteen months

21  ago.[2] Respondents do not dispute that they have detained Mr. Kaganovich in their continuous custody since

22  that date, except for a seven-day period in October 2007 when, Respondents assert, Mr. Kaganovich was

23  _____

24      [1]Mr. Kaganovich incorporates by reference the factual background set forth in his petition, but

25  provides here additional facts made available through A-file discovery provided by Respondents in the
    course of this action.

26      [2]Respondents maintain that Mr. Kaganovich entered their custody on February 9, 2007, rather than

27  February 8. See Return at 3. The one-day disparity, however, makes no difference to the merits of
    Mr. Kaganovich's habeas petition. Either way, he has been in custody for over thirteen months with no

28  reasonably foreseeable likelihood of removal.

1  transferred to the San Diego Sheriff.[3]  Since that date, the Respondents have made continuous and repeated

2  attempts to obtain travel documents from the Ukrainian government.

3  **A.              ICE's Repeated and Fruitless Efforts to Secure Travel Documents**

4              Evidence provided by the government indicates that its efforts to secure travel documents

5  began shortly after Mr. Kaganovich's removal order became final on February 5, 2007, continued through

6  the pendency of his motion to reopen, and after its denial.  See Return Exh. at 31 (listing ICE's attempts to

7  obtain a travel document through Aug. 31, 2007); see also Appendix A (Post-Order Custody Review

8  Worksheet, at 4) (same, but updated through Dec. 28, 2007).  Respondents have made at least eight attempts

9  to contact the Ukrainian government over a ten-month period in 2007:  February 22; March 26; March 30;

10  July 31; August 24; August 31; November 27; and December 12.  See Ret. Exh. at 31; Appendix A at 4.

11              Three of these eight attempts occurred *before* July 20, 2007—the date that the government now

12  claims was the first day "that DHS has been free to pursue efforts to repatriate Kaganovich to [the]

13  Ukraine."  See Ret. at 1; Appendix A at 4.  Two of these attempts—March 26 and 30—occurred *after*

14  Mr. Kaganovich filed his motion to reopen and request for stay of removal with the Board of Immigration

15  Appeals (BIA), and before the motion was denied.  See Appendix A at 4.

16              The government, over the course of the eight or so attempts in ten months recorded in the

17  documents provided to Mr. Kaganovich, has been able to make contact with Ukrainian officials exactly

18  twice: First, on November 8, 2007, contact was made with consular official Roman Andorak, who claimed

19  to be handling the case.  See id.  Three short weeks later, this small step forward was retracted: Mr. Andorak

20  informed ICE that the San Francisco office, rather than his, would handle the case.  Id.  The San Francisco

21  office of the Ukrainian consulate has proved entirely unresponsive to the government's efforts to secure

22  travel documents.  See id.  Indeed, Respondent's notes reveal that ICE has had no success in so much as

23  contacting the San Francisco office of the Ukrainian consulate:

24  //

25  //

26  _____

27          [3]Respondents do not claim that they relinquished custody over Mr. Kaganovich during this time.
    To the contrary, Mr. Kaganovich's rapid return to the ICE facility indicates that he remained subject to an
28  immigration detainer.

1  11/27/07: TD request sent to Ukraine Consul in San Francisco.  No response.

2  12/12/07: Voice message left with consulate in San Francisco.  No response.

3  Appendix A at 4.

4  Respondents' efforts have been stymied apparently not only due to the non-cooperation of the

5  Ukrainian government, but also due to unresponsiveness of *their own* branch office—the Headquarters

6  Travel Document Unit (HQTDU).  Records of the local ICE Field Office indicate that, as of October 29,

7  2007, "this case does not appear to have been processed by the Ukraine Consulate or HQTDU."  Ret. Exh.

8  at 34.  As of that date, local ICE officers had made at least three requests for assistance by the HQTDU—on

9  March 26, July 31, and August 31.  See id.  Yet, as the records make clear, Respondents' own agencies were

10 refusing to cooperate with one another:

11  It appears that despite all attempts to procure a travel document, neither the Ukraine
    Consulate General nor HQTDU have any record of receiving a travel document
12  request.  The A-file contains email requests that were sent to HQTDU as well as DHL
    labels addressed to HQTDU and the Consul General.  ICE possesses a copy of a
13  Ukrainian birth certificate belonging to KAGANOVICH and has submitted this
    document along with completed passport applications to the Consul General of the
14  Ukraine and the HQTDU.

15  Ret. Exh. 34.  Subsequently, a fourth attempt was made to enlist the assistance of the Travel Document Unit

16 on December 28, 2007.  See Appendix A at 4 ("Email sent to HQTDU requesting assistance.").  All four

17 of these attempts to secure the help of ICE Headquarters predate January 16, 2008—the date the government

18 now claims "the matter was referred to DHS headquarters so that efforts could be made at a higher level of

19 authority."  See Ret. at 2, 3.[4]  These documents show that local ICE officials have been trying to enlist the

20 support of ICE headquarters for *over eleven months*—not simply since January 2008—without success.

21  Respondents do not claim, and no evidence suggests, that this state of affairs has changed.

22 Respondents provide no evidence that they have so much as gotten through to the San Francisco office of

23 the Ukrainian consulate, let alone confirmed receipt of or established progress on the travel request. Indeed,

24 Respondents do not even claim that ICE Headquarters has finally opened a case file for Mr. Kaganovich.

25

26  [4]Neither the citation provided by the government nor a review of Mr. Kaganovich's A-file
    documents provided by Respondents explains how it arrived at the January 16, 2008, date.  The
27  government's citation is to a document from October 29, 2007, which predates the purported "referral" to
28  headquarters.

**B.          Mr. Kaganovich's Motion to Reopen**

The motion to reopen that Mr. Kaganovich filed with the BIA, which the government makes much of in its return, is likewise a subject of only legal—not factual—dispute.  Both parties agree that Mr. Kaganovich filed a motion to reopen on or about March 23, 2007.  See Return at 3.  Although Mr. Kaganovich initially believed that the motion to reopen was unaccompanied by a request for an administrative stay removal, see Pet. at 3, the documentation provided by the government in the course of these proceedings has demonstrated that he was mistaken.  See Ret. Exh. at 24; see also Appendix B at 2-3 (text of Mr. Kaganovich's request for stay).

Mr. Kaganovich's motion to reopen was never granted; the government concedes that it was denied.  See Ret. at 3.  The stay of removal was not granted; the government does not claim that it was.  Neither was there ever an automatic stay of removal was imposed by operation of law or regulation in Mr. Kaganovich's case.  In sum, there was never any stay of removal in place at any relevant time—between February 8, 2007 and today—and the government does not claim otherwise.  Mr. Kaganovich pointed out in his petition that the mere filing of a motion to reopen has no effect on the running of his removal period, see Pet. at 3, and the government has not disputed this fact.

As described above, Respondents demonstrated their understanding that Mr. Kaganovich's motion had no effect on their ability to remove him by continuing to pursue travel documents from the Ukrainian embassy while the motion was pending.  See Ret. Exh. at 31 (ICE officers left a voice message with the Ukrainian consulate on March 26, 2007, and on March 30).  The motion was denied by the BIA on July 20, 2007.  The government point to no facts in the record, and there are none, that show that they were prevented from seeking travel documents during this time.

**ARGUMENT**

**I.**

**THE EXCESSIVE DETENTION OF MR. KAGANOVICH HAS EXCEEDED THE SIX-MONTH PRESUMPTIVELY REASONABLE PERIOD BY OVER TWO TIMES AND CONTINUED DETENTION VIOLATES HIS DUE PROCESS RIGHTS**

The government may not continue to detain Mr. Kaganovich because he has been in immigration custody for over thirteen months, well over the six-month period held by Zadvydas to be presumptively reasonable, and there is "good reason to believe there is no significant likelihood of removal

1 in the reasonably foreseeable future." Zadvydas, 533 U.S. at 701.  The government has engaged in ongoing

2 efforts to secure travel documents from the Ukrainian government since February 22, 2007.  It has made

3 no progress at all in these efforts—as it admits, it has not even been able to get the Ukrainian government

4 to return its communications.  Respondents have not even managed to secure the cooperation of *their own*

5 Travel Documents Unit (HQTDU).  It remains unknown to this day whether either the Ukrainian embassy

6 or ICE's own HQTDU have taken any steps to open a case file for Mr. Kaganovich, let alone process his

7 travel document request.   The steadfast resistance of the Ukraine government for over twelve

8 months—twice the period deemed acceptable by the Supreme Court—easily meets Mr. Kaganovich's

9 burden to demonstrate the lack of any significant likelihood of removal in the reasonably foreseeable future.

10 The government has provided no evidence to rebut this showing; it does not even claim that there exist any

11 prospects for ameliorating the existing "communication problems" with the Ukrainian government.  See

12 Return at 4.

13       Although the government makes much of the fact that Mr. Kaganovich requested an

14 administrative stay of removal, which was pending before the BIA for about four months, its arguments are

15 unavailing for two reasons.  First, even taking the government's calculations at face value, it has admitted

16 to detaining Mr. Kaganovich for over seven months—more than Zadvydas permits.  Second, and as

17 addressed in Part B, below, Mr. Kaganovich's motion to reopen and request for stay had no effect whatever

18 on the running of his removal period.

19 **A.**     **Mr. Kaganovich's Removal Is Not Significantly Likely in the Reasonably Foreseeable**
**Future Because the Evidence Has Established the Ukrainian Government's Persistent**
20       **Refusal to Cooperate with Travel Document Request for the Past Twelve Months**

21       In the twelve months during which ICE officers made continuous attempts to secure travel

22 documents from the Ukrainian government, Respondents have made no headway at all.  Respondents have

23 documented at least eight attempts to contact the Ukrainian consulate between February 22, 2007, and

24 December 12, 2007.  See Appendix A at 4.  The results of these efforts are nil.  The Ukrainian government

25 has not issued the requested documents.  It has not informed the government that processing is underway.

26 It has not offered a projected time frame for a decision on Mr. Kaganovich's request.  It has not identified

27 a consular officer to serve as the contact for Respondents—indeed, it informed the government that Roman

28 Andorak would be handling the case, but a short 19 days later retracted its statement.  In fact, the Ukrainian

consulate has not even returned Respondents' phone calls.  See id.  The response of the Ukrainian government has been so dismal that it cannot even be said that there exists a reasonable likelihood of receiving any response at all, let alone the travel documents necessary to effect Mr. Kaganovich's removal. Respondents' own evaluation of the low likelihood of removal is evident from their records.

Comments by the ICE detention officer dated October 29, 2007, reveal that the government of Ukraine, and even ICE's own central Travel Document Unit (HQTDU) have stymied efforts to obtain travel documents:

> It appears that despite all attempts to procure a travel document, neither the Ukraine Consulate General nor HQTDU have any record of receiving a travel document request.  The A-file contains email requests that were sent to HQTDU as well as DHL labels addressed to HQTDU and the Consul General.  ICE possesses a copy of a Ukrainian birth certificate belonging to KAGANOVICH and has submitted this document along with completed passport applications to the Consul General of the Ukraine and the HQTDU.

Ret. Exh. 34.  The frustration of local ICE officers is palpable.  The documents indicate that the Ukrainian consulate has taken inconsistent positions on who will handle Mr. Kaganovich's case, and that ICE has not even been able to maintain consistent  contact with consular officials, let alone confirm that any progress has been made in obtaining travel documents. The first contact made with a live person at the Ukrainian consulate resulted in the assurance by one consular official that he would handle the case; then, three weeks later, that official reversed his position and referred Respondents to the San Francisco office.  See Appendix A at 4.  Respondents were unable to establish contact at all with the San Francisco office of the Ukrainian consulate.  See id. (requests were sent to the San Francisco office on November 27, 2007, and December 12, 2007; both were met with "No response").  This amounts to dead silence after twelve months of trying—certainly proof that there exists no significant likelihood of removal in the reasonably foreseeable future.  See Appendix A at 7 ("There is no record of a response.").

Were that not enough, the evidence not only shows no prospect of compliance or travel document issuance by the Ukrainian consulate, it demonstrates that Respondents' own agency—the Headquarters *Travel Document Unit*, whose purpose is to assist the ICE field offices with difficult-to-obtain travel documents—has taken no action all to provide such support.  See Department of Homeland Security, Office of Inspector General, ICE's Compliance With Detention Limits for Aliens With a Final Order of Removal From the United States, OIG-07-28, at 8 (February 9, 2007), available at

1   www.dhs.gov/xoig/assets/mgmtrpts/OIG_07-28_Feb07.pdf (excerpts attached hereto as Appendix C)

2   [hereafter "OIG Report"] (describing the purpose of the Travel Document Unit).  The failures of the

3   HQTDU to assist the ICE field officers belies the government's claim that Zadvydas relief is "premature"

4   because "DHS headquarters [must be permitted] an opportunity to complete its diligent efforts to obtain

5   travel documents."  Return at 2.  As the undisputed facts demonstrate, the government has wandered far

6   afield in characterizing DHS headquarters as either uninvolved until now or "diligent" in its efforts.  The

7   government's own documentation shows that local ICE officers have tried to involve the HQTDU since

8   March 26, 2007—*almost one year ago*—and have made at least four unsuccessful attempts to get HQTDU

9   to do anything at all.  See Appendix A at 4.  Headquarters' failure to respond to its own field offices or make

10  any record of its requests hardly qualifies as "diligent."

11          Indeed, the very fact that ICE field officers contacted the headquarters unit soon after

12  Mr. Kaganovich's removal order became final demonstrates that the field officers' recognition of the

13  Ukraine as a country from which travel documents are difficult to obtain.  ICE Headquarters policy

14  "requires that field offices request assistance immediately from the headquarters Travel Document Unit

15  (TDU) in cases that involve certain countries that are usually slow to provide documentation."  See OIG

16  Report at 8.  The local ICE officers' early attempts to enlist the help of the HQTDU is unsurprising.  Former

17  Soviet republics, like the Ukraine, have been recognized by the government as notorious for resisting

18  repatriation requests.  See U.S. General Accounting Office, Immigration Enforcement: Better Data and

19  Controls Are Needed to Assure Consistency with the Supreme Court Decision on Long-Term Alien

20  Detention, at 21 (May 2004) (GAO report on sources of impediments and delay in removal of deportable

21  aliens), available at  www.gao.gov/new.items/d04434.pdf   (excerpts attached hereto as Appendix F).

22  Countries like the Ukraine, the GAO has noted, are often reluctant to repatriate deportees who left their

23  native country some time ago—Mr. Kaganovich fled as a refugee in 1994, thirteen years ago—and have few

24  ties remaining with their homeland.  See id. at 21 (with little cultural or practical connection to the country,

25  these deportees will become a public charge and economic drain).

26          In any event, the government's argument here that it should be able to detain Mr. Kaganovich

27  simply because it has taken steps to secure travel documents and "the Ukraine government has not denied

28  [its] requests" is one that the Supreme Court has expressly rejected.  See Zadvydas, 533 U.S. at 702

1    (overruling the Fifth Circuit's opinion holding that continued detention is "lawful as long as 'good faith

2    efforts to effectuate . . . deportation continue' and [the alien] failed to show that deportation will prove

3    'impossible.'"). Of course, aside from its legal irrelevance, the most obvious answer to the government's

4    repeated assertion that "the Ukraine government has not denied DHS's requests for a travel document," see

5    Ret. at 2, 4, lies in the conclusions of the ICE officers themselves: The Ukrainian consulate has taken *no*

6    *action at all*. See Ret. Exh. at 34 ("this case does not appear to have been processed by the Ukraine

7    Consulate"); id. ("the Ukraine Consulate General . . . [has no] record of receiving a travel document

8    request").

9          Given this record of zero progress after a year, the most reasonable assumption is

10   "communication problems" will continue at the same rate of zero progress. Had Respondents *any* evidence

11   at all contradicting this conclusion, this case might be different. They have not; nor have they even claimed

12   to have information concerning likely future progress on Mr. Kaganovich's case, or statistics tracking the

13   rate of Ukrainian travel document issuance. Indeed, the Department of Homeland Security has itself

14   acknowledged that ICE has "no measurable standard for determining the likelihood that an alien can be

15   removed to his or her country of origin." See OIG Report at 9. Neither are these failures attributable to

16   Mr. Kaganovich, and the government does not so claim. See Appendix D ((HQ POCR Checklist, checking

17   the "No" box in response to the question "Is this a Failure to Comply (FTC) case?").

18         Respondents due not dispute that their efforts have proved fruitless due to non-cooperation

19   by the Ukrainian consulate, and it remains unclear what degree of responsibility Respondents' own agencies

20   bear in these failures. In any event, the recalcitrance of certain countries combined with DHS's own

21   mismanagement is a well-documented source of excessive detention. See OIG Report at 10 ("Long-term

22   detention is directly related to the return policies of an alien's country of origin."); see also id. at 9 (some

23   field offices use "incorrect legal standards and outdated materials"); id. at 12 (finding that reasons for

24   detainees being held over 360 days in ICE custody include "an expected removal that does not occur or a

25   belief that travel documents will be issued in a reasonable period of time"). Requiring Mr. Kaganovich to

26   remain in detention where there exists no prospect for removal due to a foreign government's refusal to

27   cooperate, as well as Respondents' own malfeasance, violates the clear rule of Zadvydas.

28         Mr. Kaganovich is entitled to release.

1  **B.        The Motion to Reopen and Stay of Removal Had No Effect On the Running of Mr. Kaganovich's Removal Period**

2

3         Although there is no dispute that Mr. Kaganovich has been detained in excess of the

4  presumptively reasonable six-month period, the government argues in its return that Mr. Kaganovich's

5  removal "was delayed by four months because he filed a motion to reopen with the . . . BIA and sought a

6  stay of removal."  Return at 1.  In effect, what the government's argument boils down to is that the length

7  of Mr. Kaganovich was excessive (7 months) rather than egregiously excessive (13 months).  Because there

8  exists no reasonable likelihood of removal either way, see supra, its argument is irrelevant to the resolution

9  of this case.

10         In any event, the government's argument is just plain wrong, and entirely without support in

11  the law.  See Return at 1 (citing no authority to support claim that DHS was prevented from taking action

12  to remove Mr. Kaganovich until July 20, 2007).  The law is clear: as Mr. Kaganovich explained in his

13  Petition, the mere filing of a motion to reopen does not stop or in any way affect the removal period, see Pet.

14  at 3—and the government does not claim that it does.  The law is likewise clear as to the effect of the filing

15  of a request for an administrative stay of removal.  8 C.F.R. § 1003.2[5] governs motions to reopen and stay

16  requests before the Board of Immigration Appeals, which is what Mr. Kaganovich filed.  See Appendix B.

17  That provision explains that "unless a stay of execution is specifically granted by the Board, the Immigration

18  Judge, or an authorized officer of the Service," execution of the final order of removal "*shall* proceed."  8

19  C.F.R. § 1003.2(f); see also 8 C.F.R. § 1003.23(b)(1)(v) (same for motions to reopen before the immigration

20  court).   In other words, the regulations require—not just allow—DHS to pursue physical removal of

21  Mr. Kaganovich so long as his stay and motion to reopen are pending.

22         The evidence reveals that Respondents understood that Mr. Kaganovich's motions had no

23  effect on their ability to remove him.  The efforts Respondents' made to effectuate removal during the

24  pendency of his motion reflect this state of the law.  Twice while Mr. Kaganovich's motions were pending,

25  on March 26 and March 30, Respondents attempted to contact the Ukrainian consulate to follow up on the

26  document request.  Ret. Exh. 31.  These facts belie the government's suggestion now "[i]t has only been

27

28         [5]Relevant federal regulations are attached hereto as Appendix G.

1   since July 20, 2007, that DHS has been free to pursue efforts to repatriate Kaganovich to Ukraine." Return

2   at 1. Tellingly, Respondents provide no citation at all to support their position—not to statute, regulation,

3   case law, or any other authority—because there exists no such authority.

4          In fact, the Practice Manual issued by the Board of Immigration Appeals itself explains that

5   a stay request has no effect until it is granted:

6          A pending motion to stay removal, deportation, or exclusion does not itself stay execution
           of the order. An order of removal, deportation, or exclusion remains executable unless and
7          until such time as the Board *grants* the motion to stay.

8   Board of Immigration Appeals, <u>Practice Manual</u> § 6.3(c) (emphasis in original), <u>available at</u>

9   http://www.usdoj.gov/eoir/bia/qapracmanual/apptmtn4.htm (excerpts attached hereto as Appendix E). The

10  BIA never granted either the motion to reopen or the request for stay. Nor is there any claim here that an

11  automatic stay of removal prevented Mr. Kaganovich's removal, and there was none. There are only three

12  circumstances when an order of removal is automatically stayed, none of which apply here: (1) upon direct

13  appeal of the Immigration Judge's decision on the merits; (2) on appeal of an IJ's denial of a motion to

14  reopen *in absentia* deportation proceedings; and (3) within the 30-day filing period for either of the above

15  two appeals. <u>See</u> BIA Practice Manual at § 6.2 (automatic stays); <u>cf.</u> 8 C.F.R. § 1003.6(b). None of these

16  circumstances existed here, and the government does not claim that they did. <u>See</u> <u>id.</u> ("There are no other

17  instances in which an automatic stay of removal, deportation, or exclusion takes effect.").

18         In sum, Mr. Kaganovich's motion to reopen and request for stay had no effect at all on the

19  running of his removal period, and did not relieve the government of its duty of pursuing removal during

20  their pendency. The government's claim to the contrary not only has no support in the law, it is refuted by

21  the fact that Respondents actually did continue to pursue removal during the relevant period. Thus,

22  Respondents' continued detention of Mr. Kaganovich is not just excessive, but egregiously excessive in

23  violation of <u>Zadvydas</u>.

24  //

25  //

26  //

27  //

28  //

11

**CONCLUSION**

For the reasons set forth above, in the Petition for Writ of Habeas Corpus, and the pleadings and documents on file in this case, Mr. Kaganovich's Petition should be granted.

Respectfully submitted,

Dated: March 3, 2008                    /s/ JANET C. TUNG
                                        **Federal Defenders of San Diego, Inc.**
                                        Attorneys for VITALIY KAGANOVICH
                                        Email:  Janet_Tung@fd.org

12

INDEX TO APPENDICES

CASE No. 07-CV-02403-JAH (AJB)

Appendix A    Custody Review Worksheet

Appendix B    Motion to Reopen, Remand, and Request for Stay of Removal

Appendix C    ICE Compliance Manual

Appendix D    HG POCR Checklist for 241.4 Reviews

Appendix E    BIA Practice Manual

Appendix F    GAO Report to Congressional Requestors, Immigration Enforcement

Appendix G    CFR Title 8, Aliens and Nationality

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| VITALIY KAGANOVICH, | ) | CASE No. 07-CV-02403-JAH (AJB) |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | PROOF OF SERVICE |
| | ) | |
| DEPARTMENT OF HOMELAND | ) | |
| SECURITY, et al., | ) | |
| | ) | |
| Respondents. | ) | |

I, the undersigned, say:

1) That I am over eighteen years of age, a resident of the County of San Diego, State of California, and not a party in the within action;

2) That my business address is 225 Broadway, Suite 900, San Diego, California, 92101;

3) That I served the within TRAVERSE via ECF/NEF and caused to be delivered a true and correct copy of the above-mentioned document to:

KAREN P. HEWITT
ATTN: Civil Processing Unit
880 Front Street
San Diego, CA  92101

and

4) That I caused to be delivered a courtesy copy to Chambers of the Honorable William Q. Hayes.

I certify under the laws of the State of California that the foregoing is true and correct. Executed on 3 March 2008 at San Diego, California.

/s/ JANET C. TUNG
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, CA 92101
PH: (619) 234.9467
Email: Janet_Tung@fd.org