# APPENDIX A

# POST ORDER CUSTODY REVIEW WORKSHEET

**Name:** KAGANOVICH, Vitaliy Semenovich          **Date of Birth:** 08/17/1970

**Number:**          71 243 964          **AKA(s):** KAGANOVICH,

**Place of Birth:**          Ukraine          **Nationality:**   Ukrainian

**Date of Last Arrival:** 02/24/2001          **Place of Arrival:** SYS

**Status at Last Entry:** Refugee          **Last Date into ICE Custody:** 10/26/2007

**Entered ICE Custody from:**     ☐ **Local, State, or Federal Institution**
                                      **Institution Name/Location:**
                                      **BOP/ Institution Numbers:**

                                  ☒ **Other:**  Customs and Border Protection

**Deportation Case Officer:** Dale Reed          **Review Date:** 02/05/2008
**Contact Phone #:**    619-710-8331

**ICE Location Detained and DCO:** Otay detention Facility; SND

## Deportation/Exclusion/Removal Proceedings

**List all Charges:**     ☐  Section 237 (a)
                          ☒  Section 212 (a)(6)(E)(i)
                          ☐  Section 241 (a)

☒ Under <u>Final Order</u> dated: <u>07/20/2007</u> by ☐ IJ ☒ BIA ☐ Other:

☐ Appeal Waived/Appeal Time Elapsed

Habeas filed: ☐ Yes/ Date & Location filed ☒ No

Stay Issued in Case: ☒ No ☐ Yes/Why and Who Issued

## Legal Representative / Attorney

**G-28 Filed:**   ☒ Yes     ☐ No

**Notification of Review Made:**  ☒ No     ☐ Yes  By:

**Name of Representative / Attorney:** Federal Defenders of San Diego, Inc.

**Mailing Address:**  NBC Bldg 225 Broadway, Ste 900
                      San Diego, CA. 92101-4999

**Present during interview:**   ☐ Yes ☒ No

(Rev. 1/19/05)                    Page 1

**Immigration History:** Prior ICE arrests/parole/bond/custody information/adjustment/benefits granted (TPS, DED, withholding, etc.)

---

04/05/94: Entry into US via New York as a refugee.

05/09/95: Resident Alien status.

01/24/01: Arrested at SYS POE for attempted alien smuggling.

02/24/01: Arrested at the SYS POE for attempted alien smuggling.

02/25/01: NTA filed for alien smuggling; paroled into US and released.

01/28/02: Subject files for cancellation of removal via EOIR.

07/30/02: IJ orders removal from the United States to the Ukraine; subject reserves appeal.

08/26/02: Appeal received by BIA.

01/15/04: BIA upholds removal order.

02/11/04: Subject files appeal with 9th Circuit.

12/12/06: 9th Circuit dismisses appeal.

03/29/04: Appeal filed with 9th Circuit.

02/09/07: Arrested by SND Fugitive Operations Unit, taken into ICE custody.

03/23/07: Subject files motion to reopen with BIA.

07/20/07: BIA dismisses motion to reopen.

10/25/07: POCR conducted at ODF, with recommendation for Continued Detention.

10/29/07: SND AFOD affirms Continued Detention.

---

**NCIC Checks:**          ☐ Criminal History          ☒ No Record Found
                              (State and Federal)

**Criminal History:** (list convictions, sentence, date, court, and include a summary of other NCIC arrests, failures to appear, etc.)
(DO NOT FORWARD A COPY OF THE NCIC PRINTOUT TO HQCDU)

---

02/24/01 Arrested for attempted alien smuggling at SYS POE; no disposition found.

---

## Institutional / Disciplinary Record

**Did the detainee have prior Disciplinary Reports?**          ☐ Yes          ☒ No

    If Yes, List & Describe:

    Source:

**Disciplinary reports and incidents while in ICE Custody?**          ☐ Yes          ☒ No

    If Yes, List & Describe:

    Source:

## Specifics of Review

**Date of File Review:** 02/5/08

**Date of Detainee Interview:** (optional)

**Location of Interview:**

**Reviewing/Interviewing Officer:** #1: D. Reed.

                #2:

**Interpreter Used:** (If subject was interviewed)    ☐ Yes    ☐ No
**Name:**
**Language/Dialect:**

**Discussion at interview/review:**

No interview conducted, only file review.

**Travel Document Status/History:**

List aliens attempts to get travel documents and status (to include any actions alien has taken to *prevent* removal, and date of service of I-229(a) and Instruction Sheet to Detainee):

02/22/07: KAGANOVICH was served with an I-229(a).

List ICE's attempts to obtain a travel document and status:

02/27/07: TD request sent to the Ukrainian Consulate Washington D.C.

03/26/07: Voice message left with Ukrainian Consulate; assistance request sent to HQTDU.

03/30/07: Follow-up inquiry left with Ukrainian Consulate.

07/31/07: E-mail inquiry left with Ukrainian Consulate and to HQTDU Officer Koransky.

08/24/07: Voicemail inquiry left with Ukrainian Consulate; & email inquiry sent to HQTDU Officer Koransky.

08/31/07: Voicemail inquiry left with Ukraine Consulate and with HQTDU Officer Mikhalov.

11/08/07: Roman Andarak, Ukraine Consulate, says he will be handling case.

11/27/07: Roman Andarak says the San Francisco office will handle this case.

11/27/07: TD request sent to Ukraine Consul in San Francisco. No response.

12/12/07: Voice message left with consulate in San Francisco. No response.

12/28/07: Email sent to HQTDU requesting assistance.

**Does the detainee have a place to live in the United States?** ☒ Yes ☐ No
Describe: 8030 Linen Drive; Santee, CA 92071.

**Is the detainee subject to any parole or probation requirements?** ☐ Yes ☒ No
Describe: No information provided.

**Does the detainee have close family ties within the United States?** ☒ Yes ☐ No
Describe: Wife Florentina Kofman, 2 minor children.

**Does the detainee have community ties or non-governmental sponsors?** ☒ Yes ☐ No
Describe: Case Manager Elena Dubovenko; Jewish Family Services; 8804 Balboa Avenue; San Diego, CA 92123 phone 858 637-3052.

**Does the detainee have any employment prospects?** ☐ Yes ☒ No
Describe: No Information provided.

**What is the detainee's employment history?**
Describe: Taxi driver, no other information provided.

**What is the detainee's educational level?**
Describe: No information provided.

**Does the detainee have any vocational training?** ☐ Yes ☒
Describe: No information provided.

**Has the detainee submitted any evidence of rehabilitation, courses while in prison, etc?**
Describe: No Information provided

## Medical/Psychological Concerns

**Does the detainee have any medical or psychological issues:** ☐ Yes ☒ No

**Description (to include Date and Source):**

**Other documentary evidence for consideration in this review (include any documentation submitted by detainee):**

```

```

## Special Circumstances Concerns

**Does the detainee appear to meet any of the criteria of 8 CFR 241.14 for continued detention?**

☒ No        ☐ Yes (indicate below):

☐    Aliens with a Highly Contagious Disease that is a Threat to Public Safety [8 CFR § 241.14(b)].

☐    Aliens Detained on Account of Serious Adverse Foreign Policy Consequences of Release [8 CFR § 241.14(c)].

☐    Aliens Detained on Account of Security or Terrorism Concerns [8 CFR § 241.14(d)].

☐    Detention of Aliens Determined to be Specially Dangerous [8 CFR § 241.14(f)]. Aliens who pose a threat to the public because they have committed a crime of violence, have a mental disorder and behavior associated with the disorder, and are likely to be violent in the future.

# All cases that may possibly meet any of these provisions must be coordinated with HQCDU per existing guidance.

(Rev. 1/19/05)                    Page 6

# Officer Comments/Analysis & Recommendation

KAGANOVICH is a 38-year-old native and citizen of the Ukraine who originally entered the United States on 04/05/94 at NYC as a refugee. On 05/09/95, KAGANOVICH adjusted status to Legal Permanent Resident. On 02/24/01, INS served KAGANOVICH with an NTA at SYS POE for alien smuggling, KAGANOVICH was taken into custody.

On 07/30/02, an IJ ordered KAGANOVICH removed to the Ukraine.

KAGANOVICH filed an appeal via BIA on 03/23/07; which was denied on 07/20/07. The first POCR was completed on 10/25/07, with a recommendation for continued detention; the AFOD concurred on 10/29/07.

KAGANOVICH's A-file contains letters and email requests that were sent to HQTDU, as well as DHL labels addressed to HQTDU and the Ukrainian Consulate since the decision was made to continue detention. There is no record of a response. This office will continue its efforts to secure a travel document.

KAGANOVICH would be a flight risk if released from ICE custody, based on the stringent manner in which he has resisted removal efforts. Based on the potential that a travel document can be obtained, I recommend continued detention.

---

Reviewing Officer #1  
Name/Title:   Kent D. Haroldsen - SDDO

Date:  
Signature:_____

---

Reviewing Officer #2  
Name/Title:   Eddie C. Johnson - SDDO

Date:  
Signature:_____

---

Supervisory Reviewing Officer  
Name/Title:   John A. Garzon - AFOD

Date:  
Signature:_____

## DECIDING OFFICIAL'S CUSTODY DETERMINATION

☐   RELEASE FROM CUSTODY / ORDER OF SUPERVISION  
☐   CONTINUE IN CUSTODY - RETAIN CUSTODY JURISDICTION  
☐   CONTINUE IN CUSTODY - REFER TO HQCDU  

Comments:

ICE Field Office:

Signature of Field Office Director:_____   Date: _____

Deciding Official Name:

# APPENDIX B

**Stender & Pope, PC**
1010 Second Avenue
Suite 2300
San Diego, CA 92101
619-238-8080 voice
619-238-9080 facsimile



DEPARTMENT
OF HOMELAND SECURITY
U.S. IMMIGRATION
AND CUSTOMS ENFORCEMENT

2007 MAR 26  P  3: 42

OFFICE OF CHIEF COUNSEL
SAN DIEGO, CA.

DHS
Chief Counsel

4-05

# UNITED STATES DEPARTMENT OF JUSTICE
# EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## Board of Immigration Appeals
### Falls Church, Virginia

File No.
A71 243 964

## IN THE MATTER OF:

### Vitaliy Semenovich KAGANOVICH

*Respondent*

## MOTION TO REOPEN, REMAND, AND
## REQUEST FOR STAY OF REMOVAL

March 21st, 2007

# INTRODUCTION[1]

The Respondent moves the Board of Immigration Appeals ("BIA" or "Board") to reopen these proceedings and grant a stay of removal. The Board should reopen and reconsider this case in the interests of equity and justice. Jurisdiction is proper with the Board, as the Respondent's final proceeding was before the BIA. The Respondent also requests that the BIA grant his request for a stay of removal, pending consideration of this motion to reopen.

## STATEMENT OF FACTS

The Respondent is a native and citizen of the Ukraine, and ethnically Jewish. He entered the United States on April 4, 1994 as a refugee from the Ukraine, his refugee status based on his Jewish ethnicity and religion. The Respondent was placed into removal proceeding on a Notice to Appear for alien smuggling under section 212(a)(6)(E)(I) of the Immigration & Nationality Act.

The Respondents was denied Cancellation of Removal under section 240A(a) of the Immigration and Nationality Act ("INA"); Asylum under INA section 208, Withholding, under INA section 241(b)(3) and protection under the Convention Against Torture on July 30, 2002 by an Immigration Judge ("IJ") in San Diego,

---

[1]Counsel reserves the right to supplement this Motion, including providing additional grounds for the Motion, as more information becomes available.

-1-

California. The IJ denied his application for Cancellation because he failed to accrue the necessary seven years after admission. The IJ denied Asylum, Withholding, and CAT because of a negative credibility finding.

The Respondents filed a timely appeal with the Board. On January 15, 2004, the BIA adopted and affirmed the IJ's decision, thereby dismissing the appeal. On December 12, 2006, the Ninth Circuit Court of Appeals upheld the findings of the Board and IJ.

This Motion to Reopen ensues.

## LEGAL ARGUMENT

### I. Request for Stay of Removal

The Respondent requests a stay of removal. 8 C.F.R. § 1003.23(b)(v). In order to grant a stay generally, the Ninth Circuit requires "either (1) a probability of success on the merits and the possibility of irreparable injury, or (2) that serious legal questions are raised and the balance of hardships tips sharply in the petitioner's favor." *Abbassi v. INS*, 143 F.3d 513, 514 (9th Cir. 1998); *Andreiu v. Ashcroft*, 253 F.3d 477 (9th Cir. 2001) (en banc), *Maharaj v. Ashcroft*, 295 F.3d 963 (9th Cir. 2002).

In this case, the Respondent merits a stay of removal. If the Respondent is removed to Ukraine, the Board will lose jurisdiction over the Motion to Reopen. *See*

-2-

8 C.F.R. § 1003.23(b)(1). Thus, there will be irreparable injury to the Respondent. Furthermore, the Respondent has a probability of success on the merits, as he is ethnically Jewish and from the Ukraine, and conditions have deteriorated since his case was heard.

If the BIA denies the Respondent's stay, it will lose all jurisdiction over this motion to reopen and it will be unable to consider the merits of the Respondent's arguments, therefore, the Respondent will be substantially prejudiced. Moreover, neither the DHS nor the public will be harmed if the BIA grants a stay of removal in this case.

## II.  Motions to Reopen

A motion to reopen must be in the form of a written motion to the BIA.  8 C.F.R. § 1003.2(a).  The decision to grant or deny a motion to reopen is within the discretion of the Board.  *Id.*  The BIA has discretion to deny a motion to reopen even if the moving party has made out a prima facie case for relief.  *Id.*  A motion to reopen must be filed within 90 days of the date of entry of a final administrative order of removal.  *See* 8 C.F.R. § 1003.2(c)(2).

A motion to reopen shall state new facts that will be proven at a hearing to be held if the motion is granted and shall be supported by affidavits or other evidentiary material.  8 C.F.R. § 1003.2(c)(1).  "A motion to reopen proceedings shall not be

# APPENDIX C

# DEPARTMENT OF HOMELAND SECURITY

# Office of Inspector General

ICE's Compliance With Detention Limits
for Aliens With a Final Order of Removal
From the United States



OIG-07-28                                    February 2007

*Office of Inspector General*

**U.S. Department of Homeland Security**
Washington, DC 20528

 **Homeland Security**

February 9, 2007

Preface

The Department of Homeland Security (DHS) Office of Inspector General (OIG) was established by the Homeland Security Act of 2002 (*Public Law 107-296*) by amendment to the Inspector General Act of 1978. This is one of a series of audit, inspection, and special reports prepared by our office as part of our oversight responsibilities to promote economy, effectiveness, and efficiency within the department.

This report assesses Immigration and Customs Enforcement's (ICE) compliance with U.S. Supreme Court rulings and ICE's implementation of regulations on the detention of aliens with a final order of removal. This report is based on interviews with employees of relevant government agencies and *pro bono* organizations, file reviews, and direct observation and statistical analysis.

Our recommendations were developed based on the information available to our office. The draft recommendations were discussed with those responsible for implementation. We hope that this report will result in more effective, efficient, and economical operations. We appreciate all of those who contributed to the preparation of this report.

*Richard L. Skinner*
Richard L. Skinner
Inspector General

# Contents

Executive Summary ........................................................................................ 1

Background ................................................................................................... 3

Results of Review ........................................................................................... 9

Compliance With Regulations Requires More Attention and Diligence ...................... 9

    Majority of Detainees Are Removed Within 90 Days But More Oversight Is Needed ......... 10

    Inconsistent Use of Available Guidance and Resources by Field Offices Contributes to
    Compliance Issues .................................................................................... 13

Resource Allocation and Management Constrains the POCR Process ........................ 18

    POCR Compliance Oversight Is Limited .......................................................... 19

    TDU Support for the POCR Process Is Not Adequate .......................................... 24

Making Removals a Priority Requires Additional Resources, Support, and Oversight ............ 26

    Removals of National Interest Cases and Dangerous Aliens Should Be Prioritized ............. 27

    Likelihood of Removal Standard Needs to be Documented and Transparent ..................... 30

    Oversight of Aliens Held Longer Than 180 Days Is Insufficient ................................. 32

Management Comments and OIG Analysis ......................................................... 36

## Appendices

Appendix A: Purpose, Scope, and Methodology ..................................................... 43
Appendix B: Management Response to Draft Report ................................................ 45
Appendix C: POCR Timeline .......................................................................... 49
Appendix D: Detentions Past 360 Days, By Region Of Origin ..................................... 50
Appendix E: Special Circumstances Cases ........................................................... 51
Appendix F: Substantive Deficiencies in POCR Worksheets ....................................... 53
Appendix G: Procedural Challenges and Best Practices ............................................ 54
Appendix H: Major Contributors to the Report ..................................................... 57
Appendix I: Report Distribution ...................................................................... 58

## Abbreviations

| | |
|---|---|
| DACS | Deportable Alien Control System |
| DHS | Department of Homeland Security |
| DRO | Headquarters Office of Detention and Removal Operations |
| ENFORCE | Enforcement Case Tracking System |
| GAO | Government Accountability Office |
| HQCDU | Headquarters Custody Determination Unit |
| ICE | Immigration and Customs Enforcement |
| INS | Immigration and Naturalization Service |
| POCR | Post-Order Custody Review |
| OIG | Office of Inspector General |
| TDU | Travel Document Unit |

# OIG

*Department of Homeland Security*
*Office of Inspector General*

## Executive Summary

In June 2001, the U.S. Supreme Court ruled that an alien with a final order of removal generally should not be detained longer than six months. To justify an alien's continued detention, current laws, regulations, policies and practices require the federal government to either establish that it can obtain a passport or other travel document for the alien in the "reasonably foreseeable future," or certify that the alien meets stringent criteria as a danger to society or to the national interest. Immigration and Customs Enforcement (ICE), within the Department of Homeland Security (DHS), is responsible for ensuring compliance with the Court's ruling and final order case management.

We reviewed ICE's compliance with detention limits for aliens who were under a final order of removal from the United States, including the reasons for exceptions or noncompliance. ICE has introduced quality assurance and tracking measures for case review; however, outdated databases and current staffing resources limit the effectiveness of its oversight capabilities. Although approximately 80% of aliens with a final order are removed or released within 90 days of an order, among the Post-Order Custody Review (POCR) files we reviewed, required custody decisions were not made in over 6% of cases, and were not timely in over 19% of cases. Moreover, some aliens have been suspended from the review process without adequately documented evidence that the alien is failing to comply with efforts to secure removal. In addition, cases are not prioritized to ensure that aliens who are dangerous or whose departure is in the national interest are removed, or that their release within the United States is adequately supervised. Finally, ICE has not provided sufficient guidance on applying the Supreme Court's "reasonably foreseeable future" standard, and does not systematically track removal rates — information that is necessary for negotiating returns and for determining whether detention space is used effectively.

The weaknesses and potential vulnerabilities in the POCR process cannot be easily addressed with ICE's current oversight efforts, and ICE is not well positioned to oversee the growing detention caseload that will be generated by DHS' planned enhancements to secure the border.

To address these challenges we are recommending: holding ICE field offices more accountable for the quality and timeliness of the POCR process while also increasing ICE headquarters assistance in obtaining travel documents; prioritizing the removal of aliens who represent a serious threat to society or the public interest; developing an objective and transparent methodology for evaluating the likelihood of removal for all cases; and intensifying the monitoring of long-term detainees. ICE concurred with three of our five recommendations, which we consider resolved but open pending our receipt of ICE's proposed actions.

# Background

The June 2001 U.S. Supreme Court decision reversed the former Immigration and Naturalization Service's (INS) practice of indefinitely detaining aliens who were difficult to remove but represented a threat to the community or would likely abscond if released. Aliens affected by the decision include both legal and illegal entrants – those who entered or remained in the United States illegally, and those whose legal permanent residency or other legal status was revoked because of a criminal conviction. The Supreme Court held that indefinite detention of these aliens raised "serious constitutional concerns," as "[f]reedom from imprisonment – from government custody, detention, or other forms of restraint – lies at the heart of the liberty" that the constitution protects.[1] In 2005, the Supreme Court extended the same protection to inadmissible aliens, namely aliens apprehended at a port of entry.[2]

The INS Office of Detention and Removals (DRO), which was transferred into ICE in March 2003 with the creation of DHS, drafted regulations and guidance describing the Supreme Court's decision as explaining that "the period of time which can be considered as 'the reasonably foreseeable future,' becomes increasingly shorter as the length of time the alien has been held in post-order INS detention increases. In other words, the longer an alien remains in INS custody after being ordered removed, the higher the burden on the government to establish that the alien's removal is going to occur in the reasonably foreseeable future."[3]

To justify prolonged detention, current laws, regulations, policies and practices require the federal government to either establish that removal can be secured in the reasonably foreseeable future, or prove that a detainee meets certain stringent criteria outlined below.

## Overview of Statutory and Regulatory Requirements

Regulations provide for an initial removal period of 90 days, after which the detainee receives a post-order custody review, or POCR. The 90-day POCR essentially considers three criteria:

---

[1] <u>Zadvydas v. Davis</u> 533 U.S. 678, 682, 690 (2001).
[2] <u>Clark v. Martinez</u> 543 U.S. 371 (2005).
[3] INS Detention and Removal Manual, Chapter 17.

1) <u>Flight Risk</u> – Whether the alien is likely to abscond if released, based on the alien's cooperation with the removal process, and ties to the community, such as family and employment prospects.

2) <u>Danger to Community</u> – Whether the alien poses a danger to the general public, based on criminal history, recidivism, and disciplinary record while in prison or ICE custody.

3) <u>Likelihood of Obtaining Travel Documents</u> – Whether travel documents appear forthcoming or have already been obtained, and removal is therefore imminent.

If the alien is not released or removed, and is cooperating with the removal process and has not obtained a stay of removal from the court, the second review in the POCR process is conducted as soon as possible after 180 days have elapsed from the final order of removal. The 180-day review considers two criteria:

1) <u>Significant Likelihood of Removal in the Reasonably Foreseeable Future</u> – Whether it is reasonable to believe that travel documents can be obtained, given the federal government's efforts, the receiving country's willingness to accept the alien, and other factors for consideration. The regulations require the Headquarters Custody Determination Unit (HQCDU) to "consider all the facts of the case including, but not limited to, the history of the alien's efforts to comply with the order of removal, the history of the Service's efforts to remove aliens to the country in question or to third countries, including the ongoing nature of the Service's efforts to remove this alien and the alien's assistance with those efforts, the reasonably foreseeable results of those efforts, and the views of the Department of State regarding the prospects for removal of aliens to the country or countries in question. Where the Service is continuing its efforts to remove the alien, there is no presumptive period of time within which the alien's removal must be accomplished, but the prospects for the timeliness of removal must be reasonable under the circumstances."[4]

2) <u>Special Circumstances</u> – Regulations outline four categories permitting detention beyond 180 days even if it is not likely that the alien can be removed in the reasonably foreseeable future: (1) aliens with a highly contagious disease that is a threat to public safety;

---

[4] 8 CFR § 241.13(f).

(2) aliens detained on account of serious adverse foreign policy consequences of release; (3) aliens detained on account of security or terrorism concerns; and, (4) aliens determined to be specially dangerous. Certifying that an alien meets one of these criteria requires substantial factual support and the concurrence of senior government officials or, for "specially dangerous" aliens, an immigration judge.[5]

Two conditions can extend detention indefinitely, essentially stopping the POCR process amid the 180-day removal period: (1) a court-granted stay of removal pending judicial review; or (2) an alien's failure to comply with the government's removal efforts. Aliens with a stay of removal must receive a review from ICE DRO at 90 days, and annually thereafter. Aliens who fail to comply with the government's efforts to secure their removal must receive regular warnings from ICE DRO of the consequences of their actions, but need not receive a review of continued detention. Aliens who fail to comply with the requirement to assist with obtaining a travel document can be criminally prosecuted.[6] Although some aliens have been convicted for non-compliance, ICE DRO was not able to provide us with an estimate of successful prosecutions. However, ICE officials explained that they were in the process of establishing a reporting mechanism.

### Previous Post-Order Custody Process Reviews

Since the Supreme Court's ruling in Zadvydas, which placed limits on the federal government's authority to detain aliens, and the transfer of INS' responsibility for detained aliens to ICE DRO, there have been a number of reports and evaluations of the POCR process:

- **June 2003:** The Inspector General for the Department of Justice reported that some "September 11 detainees who were held by the INS beyond 90 days after their final orders of removal did not receive a Post-Order Custody Review (POCR) as required by regulation."[7]

- **May 2004:** The General Accounting Office (GAO) determined that ICE could not identify detained aliens entitled to a post-order custody review, or POCR, in part because its database, the Deportable Alien

---

[5] 8 CFR § 241.14.
[6] Section 243(a) of *Immigration and Nationality Act*, 8 USC § 1253(a).
[7] *The September 11 Detainees: A Review of the Treatment of Aliens Held on Immigration Charges in Connection with the Investigation of the September 11 Attacks*, June 2003, Department of Justice Office of the Inspector General, Chapter 6. The Department of Justice Office of the Inspector General had oversight of the INS until 2003. This responsibility transferred to the DHS Office of Inspector General when the INS' detention programs moved to ICE.

Control System (DACS), is an "outdated, difficult-to-use, inefficient case management system." In addition, ICE did not provide adequate guidance to its officers to help them prioritize their workload. The GAO reported that while ICE considered its POCR program inadequately staffed, ICE needed a methodology to determine staffing needs. The GAO concluded from its review of POCR files that there was a possibility that ICE was not complying with the regulations.[8]

- **April 2006:** We determined that DACS "lacks the ability to readily provide DRO management with data analysis capabilities to manage the detention and removal program in an efficient and effective manner." Resources expended to provide a replacement for DACS had not, to date, resulted in measurable progress. We recommended that ICE meet a biannual reporting requirement on upgrading DACS to a system "capable of meeting its expanding data collection and analyses needs." We also reported that the practice of some countries to block or inhibit repatriation of their citizens, coupled with the Supreme Court rulings, resulted in release of many POCR cases. We listed China, Eritrea, Ethiopia, India, Iran, Jamaica, Laos, and Vietnam as countries blocking or inhibiting the repatriation of their citizens.[9]

In addition, in 2005 the Catholic Legal Immigration Network, Inc. (CLINIC) published the results of interviews with immigration attorneys representing clients who were in the POCR process nationwide. The report listed conditions, such as remote detention facilities, local cooperation, record keeping, staffing, and communication as problems contributing to prolonged detention. CLINIC concluded that ICE was not uniformly complying with the POCR regulations.[10]

### ICE's Quality Assurance and Oversight Initiatives

In 2004, DRO's HQCDU introduced a program to oversee the POCR process, and improve the quality and timeliness of POCR decisions in field offices. The HQCDU also sought to reduce the number of writ of *habeas corpus* petitions filed in federal courts by detainees requesting a review of the

---

[8] *Better Data and Controls Are Needed to Assure Consistency with the Supreme Court Decision on Long-Term Alien Detention,"* GAO-04-434, May 2004. In July 2004, the Government Accounting Office was renamed the Government Accountability Office.
[9] DHS OIG *"Detention and Removal of Illegal Aliens: Immigration and Customs Enforcement,"* OIG-06-33, April 2006.
[10] Catholic Legal Immigration Network, Inc., *Systemic Problems Persist In U.S. ICE Custody Reviews for "Indefinite" Detainees,* Kathleen Glynn, Sarah Bronstein, 2005.

ICE's Compliance with Detention Limits for Aliens with a Final Order of Removal from the United States

HQCDU's justification for continued detention. The primary federal *habeas corpus* statute, 28 U.S.C. § 2241, confers jurisdiction upon the federal courts to hear petitions for review of continued ICE detention. The petitioners in both the Zadvydas and Martinez decisions used *habeas corpus* petitions to secure their release from detention. ICE does not have a centralized tracking system for *habeas corpus* petitions. However, a standalone database in DRO headquarters, the Detention and Removal Information Management System, records *habeas corpus* petitions in which a field office or United States Attorney's Office requests assistance from headquarters. In the period from the Zadvydas decision to March 2006, the Detention and Removal Information Management System contained 2,152 *habeas corpus* petitions, 958 (46%) of which resulted in release, either from an ICE or United States Attorney's Office decision not to defend continued detention, or by order of a federal judge. In addition, in our previous report we said that the number of detainees released and removed as a result of the Zadvydas and Martinez decisions is not known because DRO did not begin tracking these decisions until FY 2005, and DACS still does not provide accurate reports on whether those no longer in detention were removed or released within the United States.[11]

The HQCDU developed guidance on the POCR process and standards, including sample forms and letters, and posted those items on its internal website. The 90-day POCR decision must be reviewed and signed by a Field Office Director, Deputy Director, or an individual acting in those capacities. The HQCDU provides training to Field Office Directors and staff at the annual DRO conference, to new officers during their initial training, and during field office visits. The unit also conducts follow-up visits: in FY 2005 it conducted 22 site visits; 6 site visits were conducted in FY 2006; and 24 are planned in FY 2007. At present, these field visits are the only opportunity the HQCDU has to review the quality and timeliness of the 90-day detention decision unless such cases fall within the HQCDU's jurisdiction at 180 days, and to determine whether field offices are following procedures when aliens fail to cooperate with efforts to secure their removal.

To verify that the 180-day cases are reviewed in compliance with the Zadvydas decision, the HQCDU obtains a monthly DACS update of all the POCR cases and requires field offices to report on those cases that appear to have passed 180 days. However, DACS is not structured to track certain exceptions. As a result, the HQCDU cannot determine from the DACS update

---

[11] DHS OIG "*Detention and Removal of Illegal Aliens: Immigration and Customs Enforcement,*" OIG-06-33, April 2006, page 19.

which aliens are eligible for a POCR review, and which do not require a review either because the alien has a stay of removal or is failing to comply with the government's removal efforts. The HQCDU therefore relies on monthly updates from the field offices to obtain this information. For those aliens eligible for a post-order custody review, field offices provide the HQCDU with a detailed worksheet, including a recommendation on continued detention or release. The HQCDU makes the final decision on continued detention, based primarily on the worksheets provided by the field offices. In addition, the HQCDU requires that field offices request assistance immediately from the headquarters Travel Document Unit (TDU) in cases that involve certain countries that are usually slow to provide documentation, and for all cases where the field office has not obtained a travel document within 75 days of the alien's receiving a final order. A timeline of the POCR process is contained in Appendix C: POCR Timeline.

We evaluated ICE's compliance with detention time limits for aliens with a final order of removal, including the reasons for exceptions or non-compliance. As described in detail in Appendix A, we reviewed 210 files, which were selected based upon four categories of POCR aliens: (1) those from countries that generally provide travel documents quickly, including El Salvador, Guatemala, Honduras, and Mexico; (2) those from countries that typically either refuse or delay the issuance of travel documents, including Cambodia, China, Cuba, Haiti, India, Laos, Pakistan, and Vietnam; (3) those from countries for which obtaining travel documents is less routine because there are fewer aliens requiring removal, including African and European countries; and, (4) those who had been in detention for an unusually long time, generally longer than 12 months. The requested files included only aliens who were eligible for a post-order custody review based on the Zadvydas and Martinez decisions and identified as such in the DACS database. Both male and female aliens were represented, as well as aliens with and without an aggravated felony conviction. Of the 20 female aliens whose POCR files we requested, only 6 remained in detention, 3 without a criminal record, 2 with aggravated felonies, and 1 with a minor criminal charge. Our selection method was intended to identify irregularities in the POCR process; generalizations therefore cannot be made from the cases to the POCR population as a whole.

# Results of Review

## Compliance With Regulations Requires More Attention and Diligence

Approximately 80% of post-order custody aliens are removed or released within 90 days. However, of the 210 alien files we reviewed, 14 (7%) had not received a 90-day post-order custody review, and 3 of those aliens had been detained longer than 180 days without a review. For those aliens remaining in detention, field office compliance with regulatory review requirements was inconsistent. In addition, required notification documents were not consistently provided and when provided, were not consistently timely. Some field offices were using incorrect legal standards and outdated materials, the most serious example being the misapplication of the failure to comply standard and the resulting suspension of the POCR process.

The HQCDU has provided comprehensive guidance and procedures for the 90-day and 180-day POCR decisions. It has also established a manual tracking system for the 180-day POCR decisions. However, there are weaknesses and potential vulnerabilities in the POCR process that cannot be easily addressed with ICE's current oversight efforts. These deficiencies will directly affect ICE's ability to manage the projected growth in its caseload caused by DHS' planned enhancements to secure the border as envisioned with the Secure Border Initiative, the end of "catch and release" practices, and an increase in interior enforcement programs.[12] Specifically, cases are not prioritized to ensure that aliens who are dangerous, or whose departure is in the national interest, such as war criminals and supporters of terrorist organizations, are removed or that their release within the United States is adequately supervised. In addition, there is no measurable standard for determining the likelihood that an alien can be removed to his or her country of origin. Moreover, procedures for managing post-180 day cases are inadequate, particularly when ICE has concluded that there is a significant likelihood of removing the alien in the foreseeable future, or that the alien is not cooperating.

---

[12] http://www.dhs.gov/dhspublic/interapp/press_release/press_release_0794.xml

## Majority of Detainees Are Removed Within 90 Days But More Oversight Is Needed

Previous reports and evaluations of the POCR process focused on the ICE DRO's ability to track and manage cases, as the DACS database was not designed to perform this function. The HQCDU now obtains a monthly update from DACS of all aliens in detention who have a final order of removal, information that allows some analysis of the characteristics of the POCR caseload. However, the DACS monthly update does not provide information on whether aliens no longer listed as detained have been removed to a country of origin or released within the United States.

Of the 8,690 aliens with a final order of removal who were in detention in March 2006, only 1,725 (20%) were still detained by June 2006 (see Table 1). However, detention rates vary widely by region and country of origin.

### Table 1: Detentions Past 90 Days, By Region Of Origin[13]

| Region of Origin | Aliens In Detention March 2006 | Aliens Still Detained June 2006 | Percent Still Detained June 2006 |
|---|---|---|---|
| Africa | 643 | 304 | 47% |
| Oceania | 34 | 15 | 44% |
| Asia | 1,156 | 485 | 42% |
| Caribbean | 1,220 | 396 | 32% |
| Europe | 378 | 79 | 21% |
| North America | 879 | 114 | 13% |
| South America | 640 | 69 | 11% |
| Central America | 3,740 | 263 | 7% |
| Total | 8,690 | 1,725 | 20% |

Long-term detention is directly related to the return policies of an alien's country of origin. For example, as depicted in Table 1 and Chart 1, the sharp decline in the number of detained North and Central Americans reflects high levels of cooperation from those governments in providing travel documents and accepting removals. ICE deportation officers informed us that the governments of Honduras, Guatemala, Mexico, and El Salvador routinely provide travel documents for their nationals, and that most are removed from the United States before 90 days. In Chart 1, of the 1,323 Hondurans in detention in March 2006, only 55 (4%) were still detained in June 2006, and

---

[13] See DHS statistical yearbooks for countries within each region of origin. (http://www.uscis.gov/graphics/shared/statistics/yearbook/2003/2003Yearbook.pdf).

most had been returned to Honduras.  Only 2 of 1,323 Hondurans had been in detention more than 360 days.

### Chart 1: Detention Rates By Country Of Origin



Source: DACS, OIG Analysis

In contrast, as depicted in Chart 1, the sharp decline in the number of detained Cubans, Laotians, Cambodians, and Vietnamese, reflects ICE DRO's recognition that there is usually no significant likelihood that the governments of these countries will issue travel documents for their nationals. Therefore, most aliens from these counties must eventually be released within the United States unless the stringent regulatory standards for special circumstances can be met. ICE deportation officers said that most aliens from these countries are released within the United States after 90 days. If aliens from these countries are a violent threat to the community, but do not meet the stringent standard for special circumstances cases, most are released within the United States after 180 days. For example, in March 2006 there were 203 Cubans in detention, and by June 2006 all but 28 (14%) of this group were no longer in detention, most released within the United States. Only 2 of 203 Cubans had been in detention more than 360 days. These figures, based on DACS POCR reports, do not include Cubans paroled into the United States from the 1980 Mariel boatlift, as Mariel Cubans are tracked separately in DACS.

Finally, as depicted in Chart 1, the high detention rates among Indians, Haitians, Pakistanis, and Chinese, reflect that removals are possible, but difficult, for these nationalities. Deportation officers said that these countries either provide travel documents routinely after long delays, or provide them sporadically based on internal political circumstances or diplomatic pressure from the United States. For example, in March 2006 there were 246 Chinese in detention. By June 2006, 156 (63%) were still detained because China had agreed during negotiations with the United States to accept a charter flight of its nationals, but then delayed the charter several times. Of the 246 Chinese nationals detained in March 2006, 32 had been in detention more than 360 days. During our fieldwork, ICE deportation officers informed us that the United States government had reached agreements with the governments of China, India, and Haiti to authorize the return of a substantial number of nationals from these countries and that some detained aliens had already been removed.

As shown in Appendix D: Detentions Past 360 Days the correlation between countries that are slow to produce travel documents and the length of detention some aliens experience was most apparent when we examined detention rates for the group of 428 aliens who had been detained for more than 360 days as of June 2006. Reasons for the longer detention rates among the group of 428 vary, and might include the alien's failure to comply, or a court's grant of a stay of removal. The longer detention rates might also result from an expected removal that does not occur or a belief that travel documents will be issued in a reasonable period of time. However, very few of the 428

aliens were formally certified as special circumstances cases, the four categories of cases for which continued detention is justified to protect the public or the national interest. For example, only 36 cases were held as "specially dangerous." No cases, however, were certified under the remaining three categories, as having a highly contagious disease, or a potentially adverse affect on national security, or the national interest if released. See Appendix E: Special Circumstances Cases for more information on DHS' certifications.

## Inconsistent Use of Available Guidance and Resources by Field Offices Contributes to Compliance Issues

To determine whether the detention of aliens with a final order complies with Supreme Court decisions, regulations and ICE guidance, we reviewed a sample of alien files at each of the seven DRO offices where we conducted site visits. We determined that post-order custody reviews were not consistently conducted, and that required notifications and reviews were not consistently complete or timely. While the HQCDU has developed and posted on its website extensive guidance, not all field offices visited were using the materials. The most serious consequence was that some detainees were deemed to have failed to comply, and therefore removed from the POCR process, without sufficient justification. For more information on field offices selected for site visits and our sample of alien files reviewed, see Appendix A.

### Post-Order Custody Reviews Are Not Consistently Conducted

Of the 210 alien files we examined, 82 were eligible for a post-order custody review. We determined that 11 of these 82 aliens had not received a 90-day post-order custody review, and 3 had not received either a 90-day or 180-day review. Case completion rates varied widely by field office as depicted in Figure 1 and Table 2, which illustrate the disposition of the sample files.

# APPENDIX D

# HQ POCR Checklist for 241.4 Reviews

*To be completed for all cases transferred to CDU for a custody jurisdiction review under 8 CFR § 241.13. List only actions that have occurred after the POCR (day 90) has been completed.*

A#: <u>71 243 964</u>                Field Office: <u>SND</u>                          DCO: <u>SND</u>

Alien's Name: <u>KAGANOVICH, Vitaliy Semenovich</u>

Date case transferred to HQ: <u>02/06/08</u> Date removal period began: <u>07/20/07</u>

## *List only the actions taken after the initial POCR (after day 90) has been completed:*

Date(s) served I-229(a)  1) _____        2) _____        3) _____

Date(s) served Instruction Sheet to Alien  1) _____        2) _____        3) _____

☐Yes ☒No    Is this a Failure to Comply (FTC) Case? *(If yes, the case remains with the field)*

☐Yes ☒No    If FTC, was the alien served with the I-229(a)?  Date(s) Served: 1) _____  2) _____  3) _____

☐Yes ☒No    Judicial Stay in effect? *(If yes, the case remains with the field)*    Date of Stay: _____

☐Yes ☒No    Habeas pending?    Court Venue: _____        Date filed: _____

☐Yes ☒No    Petition for Review pending?    Court Venue: _____    Date filed: _____

List all follow-up actions taken to obtain a TD *after* the initial (90-day) POCR was completed. List the dates of the consulate/embassy follow-up contacts and the name of consular officer contacted. Also list any indications that a TD will be issued (and timeframe) or denied.

Date        Consular/Embassy Person Contacted    Results regarding likelihood of issuance.
1) <u>11/08/07 Roman Andarak, Ukraine Consul, says he will be handling case.</u>
2) <u>11/27/07 Mr. Roman Andarak says that his office is not handling the case; it's the San Francisco office.</u>
3) <u>11/27/07 TD request sent to Ukrainian Consulate in San Francisco. No response.</u>
4) <u>12/12/07 Voice message left at San Francisco Consulate. No response.</u>

List all contact with HQ TDU, to include the initial request for assistance, which should have been sent after the 75th day post final order, if field efforts to obtain a TD have been unsuccessful.

Date    HQ Officer Contacted        Results regarding likelihood of issuance.
1) <u>12/28/07 E-Mail sent to HQTDU requesting assistance in obtaining travel document.</u>
2) _____

Based on any follow-up TD requests and request for assistance from HQ TDU, is there significant likelihood of removal in the reasonably foreseeable future? (Provide a brief synopsis)
<u>There is ample likelihood of issuance of a travel document, because since the original 90-day period, several requests were made to both the Ukrainian Consulate, and a request for assistance was made to the HQ Unit. Owing to their relationship and past successes, the liaison between these two entities should produce favorable results.</u>

Officer's email in Outlook: <u>REED, Dale.</u>  Officer's telephone: <u>(619) 710-8331</u>
DO Signature        *Dale Reed*

Supervisor's email in Outlook: <u>Haroldsen, Kent D.</u>  Supervisor's telephone <u>(619) 710-8310</u>

SDDO Signature

Revised October 30, 2007

# APPENDIX E

# Board of Immigration Appeals
## Practice Manual



---

*This Practice Manual has been assembled as a public service to parties appearing before the Board of Immigration Appeals.*

*This manual is strictly informational in nature. This manual is not intended, in any way, to substitute for a careful study of the pertinent laws and regulations. Readers are advised to review Chapter 1.1 before consulting any information contained herein.*

*The Practice Manual is updated periodically. The legend at the bottom of each page reflects the last revision date for that page. Updates of the Practice Manual are available through the EOIR Web site at www.usdoj.gov/eoir.*

---

## The Board of Immigration Appeals

Lori L. Scialabba, Chairman

| | |
|---|---|
| David B. Holmes | Anthony C. Moscato |
| Gerald S. Hurwitz | Neil P. Miller |
| Lauri S. Filppu | Juan P. Osuna |
| Patricia A. Cole | Roger Pauley |
| Edward R. Grant | Frederick D. Hess |

The Board would like to express its gratitude to Stephen Griswold, Andrea Macri, and David Neal for their efforts in the preparation of the Practice Manual and these Questions and Answers Regarding Proceedings Before the Board.

*Chairman, Board of Immigration Appeals*

# TABLE OF CONTENTS

Chapter 1    The Board of Immigration Appeals

Chapter 2    Appearances before the Board

Chapter 3    Filing with the Board

Chapter 4    Appeals of Immigration Judge Decisions

Chapter 5    Motions before the Board

Chapter 6    Stays and Expedite Requests

Chapter 7    Bond

Chapter 8    Oral Argument

Chapter 9    Visa Petitions

Chapter 10   Fines

Chapter 11   Discipline of Practitioners

Chapter 12   Forms

Chapter 13   Freedom of Information Act (FOIA)

Chapter 14   Other Information

Appendices

Word Index

Citation Index

# 6   Stays and Expedite Requests

## 6.1   Stays Generally

A stay prevents DHS from executing an order of removal, deportation, or exclusion. Stays are automatic in some instances and discretionary in others. This chapter provides general guidance regarding stays. For particular cases, parties should consult the controlling law and regulations. See Immigration and Nationality Act § 240(b)(5); 8 C.F.R. §§ 1003.2(f), 1003.6, 1003.23(b)(1)(v), 1003.23(b)(4)(ii), 1003.23(b)(4)(iii)(C).

The Board also has the authority to stay the execution of an Immigration Judge's decision in bond proceedings. See Chapter 7.3(a)(iv) (Stays).

## 6.2   Automatic Stays

**(a) *Qualifying appeals.*** — There are limited circumstances in which an order of removal, deportation, or exclusion is automatically stayed:

○   direct appeal of an Immigration Judge's decision on the merits of the case (not including bond and custody determinations)

○   appeal of an Immigration Judge's denial of a motion to reopen *deportation* proceedings conducted in absentia under prior section 242B of the Immigration and Nationality Act

○   the 30-day period for filing either of these appeals, unless the right to appeal has been waived

An appeal must be timely and properly filed for an automatic stay to take effect.

There are no other instances in which an automatic stay of removal, deportation, or exclusion takes effect.

**(b) *Qualifying motions.*** — There are no motions that are filed with the Board that result in an automatic stay of removal, deportation, or exclusion.

(c) *Duration.* — An automatic stay of removal, deportation, or exclusion expires when the Board renders a final decision in the case. Occasionally, when the Board grants a temporary stay, the Board may vacate or dissolve the stay before reaching the merits of the appeal or motion.

(d) *Adjudication and notice.* — When a stay is automatic, the Board does not issue a written order on the stay request.

## 6.3    Discretionary Stays

(a) *Jurisdiction.* — The Board is authorized to grant stays as a matter of discretion, but only for matters within the Board's jurisdiction. See Chapter 1.4 (Jurisdiction and Authority). The Board entertains stays only when an appeal, a motion to reopen, or a motion to reconsider is pending before the Board.

(b) *Motion required.* — A request for a discretionary stay of removal, deportation, or exclusion should be made in the form of a written motion. See Chapter 6.4 (Procedure for Requesting a Discretionary Stay). When circumstances require immediate attention from the Board, the Board may, at its discretion, entertain a telephonic stay request. See Chapter 6.4(d)(i) (Emergency). Motions requesting a discretionary stay are not automatically granted.

(c) *Pending motions.* — A pending motion to stay removal, deportation, or exclusion does not itself stay execution of the order. An order of removal, deportation, or exclusion remains executable unless and until such time as the Board *grants* the motion to stay.

(d) *Adjudication and notice.* — When a stay is granted as a matter of discretion, the Board issues a written order.

(e) *Duration.* — A discretionary stay of removal, deportation, or exclusion expires when the Board renders a final decision in the case.

**6.4    Procedure for Requesting a Discretionary Stay**

(a) *Who may request.* — An alien (or an alien's representative) may request a discretionary stay of removal, deportation, or exclusion only if the alien's case is currently before the Board and the alien is subject to a removal, deportation, or exclusion order.

(b) *Timing of request.* — A request to stay removal, deportation, or exclusion may be submitted at any time during the pendency of a case before the Board.

(c) *Form of request.* — Requests to stay removal, deportation, or exclusion must be made in writing. The Board prefers that stay requests be submitted in the form of a "MOTION TO STAY REMOVAL." See Appendix F (Sample Cover Page).

(i) *Contents.* — The motion should contain a complete recitation of the relevant facts and case history and indicate the current status of the case. The motion must also contain a specific statement of the time exigencies involved. Motions containing vague or general statements of urgency are not persuasive.

A copy of the existing Immigration Judge or Board order should be included, when available. When the moving party does not have a copy of the order, the moving party should provide the date of the Immigration Judge's decision and a detailed description of both the ruling and the basis of that ruling, as articulated by the Immigration Judge. If the facts are in dispute, the moving party should furnish evidence supporting the motion to stay.

(ii) *Format.* — The motion should comply with the general rules for filing motions. See Chapter 5.2 (Filing a Motion). The motion must include a Proof of Service. See Chapter 3.2 (Service), Appendix G (Sample Proof of Service).

(iii) *Fee.* — A motion to stay removal, deportation, or exclusion does not, by itself, require a filing fee. The underlying appeal or motion, however, may still require a fee. See Chapter 3.4 (Filing Fees).

(d) *Submitting the request.* — The Board categorizes stay requests into two categories: emergency and non-emergency.

(i) *Emergency.* — The Board may rule immediately on an "emergency" stay request. An emergency stay request may be submitted only by an alien in custody who is facing imminent removal, deportation, or exclusion. Accordingly, an alien

not in DHS custody must surrender to DHS custody, pursuant to a request by DHS, before an emergency stay will be considered by the Board.

Instructions for filing a stay motion in an emergency situation can be obtained at any time by calling (703) 605-1007. The Board will entertain an emergency stay request only on weekdays from 9:00 a.m. to 5:30 p.m. (Eastern time), except federal holidays. When an emergency stay request is granted, the Board promptly notifies the parties.

**(ii)** *Non-emergency.* — The Board does not rule immediately on a "non-emergency" stay request, but considers the request during the normal course of adjudication. A non-emergency stay request may be submitted by an alien who either is not in detention or is in detention but is not facing imminent removal, deportation, or exclusion. A non-emergency stay request may be submitted concurrently with an appeal or motion, or at a later date.

A non-emergency stay request may be supplemented by an emergency stay request if the qualifying circumstances transpire (such as when an alien reports to DHS custody for deportation).

## 6.5   Expedite Requests

**(a)** *Requirements.* — Appeals and motions may be expedited only upon the filing of a motion to expedite and a demonstration of impending and irreparable harm or similar good cause. The motion must contain a complete articulation of the reasons to expedite and the consequences to the moving party if the request is not granted.

Expedite requests are generally not favored and should be requested only in compelling circumstances. Examples of appropriate reasons to request expedited treatment include: (i) imminent removal from the Unites States; (ii) imminent ineligibility for relief, such as a minor alien "aging out" of derivative status; (iii) circumstances threatening to moot the appeal absent prompt action by the Board; and (iv) a health crisis precipitating a need for immediate Board action.

**(b)** *Procedure.* — Motions to expedite should be filed in accordance with the general rules and procedures for other motions. See Chapter 5.2 (Filing a Motion). Any request for expeditious processing should be made through a written "MOTION TO EXPEDITE" that bears the name and alien registration number ("A number") of the affected

alien and articulates the grounds for the request.  Use of a cover page is highly recommended.  See Appendix F (Sample Cover Page).  In a genuine emergency, a party may contact the Clerk's Office of the Board by telephone.  See Appendix B (Directory). Even in such situations, the moving party must be prepared to file a written "MOTION TO EXPEDITE" immediately.

   **(c)** *Response.* — The Board will consider all expedite requests that are properly filed.  When a request is granted, the Board will expedite the case without notifying the parties that the request has been granted.  For administrative reasons, the Board cannot reply to all requests.

Chapter 6 _____ Board of Immigration Appeals

# APPENDIX F

United States General Accounting Office

# GAO

## Report to Congressional Requesters

May 2004

# IMMIGRATION ENFORCEMENT

# Better Data and Controls Are Needed to Assure Consistency with the Supreme Court Decision on Long-Term Alien Detention



**G A O**
Accountability ★ Integrity ★ Reliability

GAO-04-434

supervision cases. As a result, there exist potential risks associated with such aliens being released into U.S. communities. Determining how to mitigate such risks would entail considering factors such as the significance of the risk and the likelihood or frequency of its occurrence. Such an approach could help ICE determine how deportation officers should prioritize their supervision cases when job demands prevent them from doing a consistent and thorough job of assuring alien compliance with orders of supervision.

## ICE Has Had Some Success Working with the Department of State When Travel Documents Are Difficult to Obtain

ICE's ability to deport removable aliens is impeded when the aliens' governments refuse to provide or delay providing travel documents for them. ICE headquarters and field officials said that difficulties with obtaining travel documents is the major problem they encounter in attempting to remove aliens with a final removal order. The difficulty in obtaining travel documents has a direct impact on the number of aliens who either remain in detention or are released on orders of supervision.

The process of obtaining travel documents can be complex and time-consuming. ICE headquarters and field officials cited a variety of reasons why governments may not want to issue a travel document for their nationals, and these reasons may vary for aliens from the same country depending on the individual alien's circumstances. For example, if aliens have not lived in their country of origin for a long period of time, their government may delay issuing the travel document until it has assurance that the aliens will have the means to support themselves when they are returned. The government may also want to ensure that it can keep track of aliens with criminal backgrounds. In its Detention and Removal Strategic Plan, ICE noted that the political environment in various countries can also affect their travel document policies.

According to ICE officials, several countries have consistently refused to issue travel documents or delayed issuing them, thereby limiting ICE's ability to return aliens to these countries. Specifically, ICE officials mentioned that they have significant problems obtaining travel documents from Cuba, Laos, Vietnam, China, India, Jamaica, former Soviet Republics, Iraq, Iran, Eritrea, Ethiopia, Poland, and Nigeria. Table 1 shows the numbers of aliens from Laos and Vietnam with removal orders categorized by the criminality and detention status of the aliens as examples of two countries where ICE officials reported significant problems obtaining travel documents.

# APPENDIX G

8 C.F.R. § 1003.2

▷

**Effective: [See Text Amendments]**

Code of Federal Regulations Currentness
  Title 8. Aliens and Nationality
    Chapter V. Executive Office for Immigration
    Review, Department of Justice (Refs & Annos)
      Subchapter A. General Provisions (Refs &
      Annos)
        ⌐▣ Part 1003. Executive Office for Immig-
        ration Review (Refs & Annos)
          ⌐▣ Subpart A. Board of Immigration Ap-
          peals

        ➡ **§ 1003.2 Reopening or reconsider-
        ation before the Board of Immigra-
        tion Appeals.**

  <For statute(s) affecting validity, see: 5 USCA §
            301; 6 USCA §
  521; 8 USCA §§ 1101, 1103, 1154, 1155, 1158,
  1182, 1226,
      1229, 1229a, 1229b, 1229c, 1231, 1254a, 1255,
                  1324d,
    1330, 1361, 1362; 28 USCA §§ 509, 510, 1746.>

(a) General. The Board may at any time reopen or
reconsider on its own motion any case in which it
has rendered a decision. A request to reopen or re-
consider any case in which a decision has been
made by the Board, which request is made by the
Service, or by the party affected by the decision,
must be in the form of a written motion to the
Board. The decision to grant or deny a motion to re-
open or reconsider is within the discretion of the
Board, subject to the restrictions of this section.
The Board has discretion to deny a motion to re-
open even if the party moving has made out a prima
facie case for relief.

(b) Motion to reconsider.

  (1) A motion to reconsider shall state the reas-
  ons for the motion by specifying the errors of
  fact or law in the prior Board decision and shall

be supported by pertinent authority. A motion
to reconsider a decision rendered by an Immig-
ration Judge or Service officer that is pending
when an appeal is filed with the Board, or that
is filed subsequent to the filing with the Board
of an appeal from the decision sought to be re-
considered, may be deemed a motion to remand
the decision for further proceedings before the
Immigration Judge or the Service officer from
whose decision the appeal was taken. Such mo-
tion may be consolidated with, and considered
by the Board in connection with the appeal to
the Board.

  (2) A motion to reconsider a decision must be
  filed with the Board within 30 days after the
  mailing of the Board decision or on or before
  July 31, 1996, whichever is later. A party may
  file only one motion to reconsider any given
  decision and may not seek reconsideration of a
  decision denying a previous motion to recon-
  sider. In removal proceedings pursuant to sec-
  tion 240 of the Act, an alien may file only one
  motion to reconsider a decision that the alien is
  removable from the United States.

  (3) A motion to reconsider based solely on an
  argument that the case should not have been af-
  firmed without opinion by a single Board
  Member, or by a three-Member panel, is
  barred.

(c) Motion to reopen.

  (1) A motion to reopen proceedings shall state
  the new facts that will be proven at a hearing to
  be held if the motion is granted and shall be
  supported by affidavits or other evidentiary
  material. A motion to reopen proceedings for
  the purpose of submitting an application for re-
  lief must be accompanied by the appropriate
  application for relief and all supporting docu-
  mentation. A motion to reopen proceedings
  shall not be granted unless it appears to the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

8 C.F.R. § 1003.2

Board that evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing; nor shall any motion to reopen for the purpose of affording the alien an opportunity to apply for any form of discretionary relief be granted if it appears that the alien's right to apply for such relief was fully explained to him or her and an opportunity to apply therefore was afforded at the former hearing, unless the relief is sought on the basis of circumstances that have arisen subsequent to the hearing. Subject to the other requirements and restrictions of this section, and notwithstanding the provisions in § 1001.1(p) of this chapter, a motion to reopen proceedings for consideration or further consideration of an application for relief under section 212(c) of the Act (8 U.S.C. 1182(c)) may be granted if the alien demonstrates that he or she was statutorily eligible for such relief prior to the entry of the administratively final order of deportation.

(2) Except as provided in paragraph (c)(3) of this section, a party may file only one motion to reopen deportation or exclusion proceedings (whether before the Board or the Immigration Judge) and that motion must be filed no later than 90 days after the date on which the final administrative decision was rendered in the proceeding sought to be reopened, or on or before September 30, 1996, whichever is later. Except as provided in paragraph (c)(3) of this section, an alien may file only one motion to reopen removal proceedings (whether before the Board or the Immigration Judge) and that motion must be filed no later than 90 days after the date on which the final administrative decision was rendered in the proceeding sought to be reopened.

(3) In removal proceedings pursuant to section 240 of the Act, the time limitation set forth in paragraph (c)(2) of this section shall not apply to a motion to reopen filed pursuant to the provisions of § 1003.23(b)(4)(ii). The time and numerical limitations set forth in paragraph (c)(2) of this section shall not apply to a motion to reopen proceedings:

(i) Filed pursuant to the provisions of § 1003.23(b)(4)(iii)(A)(1) or § 1003.23(b)(4)(iii)(A)(2);

(ii) To apply or reapply for asylum or withholding of deportation based on changed circumstances arising in the country of nationality or in the country to which deportation has been ordered, if such evidence is material and was not available and could not have been discovered or presented at the previous hearing;

(iii) Agreed upon by all parties and jointly filed. Notwithstanding such agreement, the parties may contest the issues in a reopened proceeding; or

(iv) Filed by the Service in exclusion or deportation proceedings when the basis of the motion is fraud in the original proceeding or a crime that would support termination of asylum in accordance with § 1208.22(f) of this chapter.

(4) A motion to reopen a decision rendered by an Immigration Judge or Service officer that is pending when an appeal is filed, or that is filed while an appeal is pending before the Board, may be deemed a motion to remand for further proceedings before the Immigration Judge or the Service officer from whose decision the appeal was taken. Such motion may be consolidated with, and considered by the Board in connection with, the appeal to the Board.

(d) Departure, deportation, or removal. A motion to reopen or a motion to reconsider shall not be made by or on behalf of a person who is the subject of exclusion, deportation, or removal proceedings subsequent to his or her departure from the United States. Any departure from the United States, including the deportation or removal of a person who

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

8 C.F.R. § 1003.2

is the subject of exclusion, deportation, or removal proceedings, occurring after the filing of a motion to reopen or a motion to reconsider, shall constitute a withdrawal of such motion.

(e) Judicial proceedings. Motions to reopen or reconsider shall state whether the validity of the exclusion, deportation, or removal order has been or is the subject of any judicial proceeding and, if so, the nature and date thereof, the court in which such proceeding took place or is pending, and its result or status. In any case in which an exclusion, deportation, or removal order is in effect, any motion to reopen or reconsider such order shall include a statement by or on behalf of the moving party declaring whether the subject of the order is also the subject of any pending criminal proceeding under the Act, and, if so, the current status of that proceeding. If a motion to reopen or reconsider seeks discretionary relief, the motion shall include a statement by or on behalf of the moving party declaring whether the alien for whose relief the motion is being filed is subject to any pending criminal prosecution and, if so, the nature and current status of that prosecution.

(f) Stay of deportation. Except where a motion is filed pursuant to the provisions of §§ 1003.23(b)(4)(ii) and 1003.23(b)(4)(iii)(A), the filing of a motion to reopen or a motion to reconsider shall not stay the execution of any decision made in the case. Execution of such decision shall proceed unless a stay of execution is specifically granted by the Board, the Immigration Judge, or an authorized officer of the Service.

(g) Filing procedures--

(1) English language, entry of appearance, and proof of service requirements. A motion and any submission made in conjunction with a motion must be in English or accompanied by a certified English translation. If the moving party, other than the Service, is represented, Form EOIR-27, Notice of Entry of Appearance as Attorney or Representative Before the

Board, must be filed with the motion. In all cases, the motion shall include proof of service on the opposing party of the motion and all attachments. If the moving party is not the Service, service of the motion shall be made upon the Office of the District Counsel for the district in which the case was completed before the Immigration Judge.

(2) Distribution of motion papers.

(i) A motion to reopen or motion to reconsider a decision of the Board pertaining to proceedings before an Immigration Judge shall be filed directly with the Board. Such motion must be accompanied by a check, money order, or fee waiver request in satisfaction of the fee requirements of § 1003.8. The record of proceeding pertaining to such a motion shall be forwarded to the Board upon the request or order of the Board.

(ii) A motion to reopen or a motion to reconsider a decision of the Board pertaining to a matter initially adjudicated by an officer of the Service shall be filed with the officer of the Service having administrative control over the record of proceeding.

(iii) If the motion is made by the Service in proceedings in which the Service has administrative control over the record of proceedings, the record of proceedings in the case and the motion shall be filed directly with the Board. If such motion is filed directly with an office of the Service, the entire record of proceeding shall be forwarded to the Board by the Service officer promptly upon receipt of the briefs of the parties, or upon expiration of the time allowed for the submission of such briefs.

(3) Briefs and response. The moving party may file a brief if it is included with the motion. If the motion is filed directly with the Board pursuant to paragraph (g)(2)(i) of this section, the opposing party shall have 13 days from the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

8 C.F.R. § 1003.2

date of service of the motion to file a brief in opposition to the motion directly with the Board. If the motion is filed with an office of the Service pursuant to paragraph (g)(2)(ii) of this section, the opposing party shall have 13 days from the date of filing of the motion to file a brief in opposition to the motion directly with the office of the Service. In all cases, briefs and any other filings made in conjunction with a motion shall include proof of service on the opposing party. The Board, in its discretion, may extend the time within which such brief is to be submitted and may authorize the filing of a brief directly with the Board. A motion shall be deemed unopposed unless a timely response is made. The Board may, in its discretion, consider a brief filed out of time.

(h) Oral argument. A request for oral argument, if desired, shall be incorporated in the motion to reopen or reconsider. The Board, in its discretion, may grant or deny requests for oral argument.

(i) Ruling on motion. Rulings upon motions to reopen or motions to reconsider shall be by written order. Any motion for reconsideration or reopening of a decision issued by a single Board member will be referred to the screening panel for disposition by a single Board member, unless the screening panel member determines, in the exercise of judgment, that the motion for reconsideration or reopening should be assigned to a three-member panel under the standards of § 1003.1(e)(6). If the order directs a reopening and further proceedings are necessary, the record shall be returned to the Immigration Court or the officer of the Service having administrative control over the place where the reopened proceedings are to be conducted. If the motion to reconsider is granted, the decision upon such reconsideration shall affirm, modify, or reverse the original decision made in the case.

[27 FR 96, Jan. 5, 1962; 61 FR 18904, April 29, 1996; 61 FR 32924, June 26, 1996; 62 FR 10330, March 6, 1997; 64 FR 56142, Oct. 18, 1999; 67 FR 54904, Aug. 26, 2002; 68 FR 10350, March 5, 2003]

SOURCE: 52 FR 2936, 2941, Jan. 29, 1987; 57 FR 11570, April 6, 1992; 60 FR 29468, June 5, 1995; 61 FR 59305, Nov. 22, 1996; 63 FR 27448, May 19, 1998; 63 FR 31894, June 11, 1998; 64 FR 56141, Oct. 18, 1999; 66 FR 37123, July 17, 2001; 66 FR 54911, Oct. 31, 2001; 66 FR 56976, Nov. 14, 2001; 68 FR 9830, Feb. 28, 2003; 68 FR 9824, Feb. 28, 2003; 68 FR 9830, Feb. 28, 2003; 71 FR 57884, Oct. 2, 2006; 71 FR 70857, Dec. 7, 2006, unless otherwise noted.

AUTHORITY: 5 U.S.C. 301; 6 U.S.C. 521; 8 U.S.C. 1101, 1103, 1154, 1155, 1158, 1182, 1226, 1229, 1229a, 1229b, 1229c, 1231, 1254a, 1255, 1324d, 1330, 1361, 1362; 28 U.S.C. 509, 510, 1746; sec. 2 Reorg. Plan No. 2 of 1950; 3 CFR, 1949-1953 Comp., p. 1002; section 203 of Pub.L. 105-100, 111 Stat. 2196-200; sections 1506 and 1510 of Pub.L. 106-386, 114 Stat. 1527-29, 1531-32; section 1505 of Pub.L. 106-554, 114 Stat. 2763A-326 to -328.

8 C. F. R. § 1003.2, **8 CFR § 1003.2**

Current through February 21, 2008; 73 FR 9625

Copr. © 2008 Thomson/ West

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

8 C.F.R. § 1003.6

**C**

**Effective: November 01, 2006**

Code of Federal Regulations Currentness
  Title 8. Aliens and Nationality
    Chapter V. Executive Office for Immigration
    Review, Department of Justice (Refs & Annos)
      Subchapter A. General Provisions (Refs &
      Annos)
        ⌐⊞ Part 1003. Executive Office for Immig-
        ration Review (Refs & Annos)
          ⌐⊞ Subpart A. Board of Immigration Ap-
          peals

        →§ 1003.6 Stay of execution of de-
        cision.

(a) Except as provided under § 236.1 of this
chapter, § 1003.19(i), and paragraph (b) of this sec-
tion, the decision in any proceeding under this
chapter from which an appeal to the Board may be
taken shall not be executed during the time allowed
for the filing of an appeal unless a waiver of the
right to appeal is filed, nor shall such decision be
executed while an appeal is pending or while a case
is before the Board by way of certification.

(b) The provisions of paragraph (a) of this section
shall not apply to an order of an Immigration Judge
under § 1003.23 or § 242.22 of 8 CFR chapter I
denying a motion to reopen or reconsider or to stay
deportation, except where such order expressly
grants a stay or where the motion was filed pursu-
ant to the provisions of § 1003.23(b)(4)(iii). The
Board may, in its discretion, stay deportation while
an appeal is pending from any such order if no stay
has been granted by the Immigration Judge or a
Service officer.

(c) The following procedures shall be applicable
with respect to custody appeals in which DHS has
invoked an automatic stay pursuant to 8 CFR
1003.19(i)(2).

  (1) The stay shall lapse if DHS fails to file a

notice of appeal with the Board within ten busi-
ness days of the issuance of the order of the im-
migration judge. DHS should identify the ap-
peal as an automatic stay case. To preserve the
automatic stay, the attorney for DHS shall file
with the notice of appeal a certification by a
senior legal official that--

  (i) The official has approved the filing of the
  notice of appeal according to review proced-
  ures established by DHS; and

  (ii) The official is satisfied that the contentions
  justifying the continued detention of the alien
  have evidentiary support, and the legal argu-
  ments are warranted by existing law or by a
  non-frivolous argument for the extension,
  modification, or reversal of existing precedent
  or the establishment of new precedent.

  (2) The immigration judge shall prepare a writ-
  ten decision explaining the custody determina-
  tion within five business days after the immig-
  ration judge is advised that DHS has filed a no-
  tice of appeal, or, with the approval of the
  Board in exigent circumstances, as soon as
  practicable thereafter (not to exceed five addi-
  tional business days). The immigration court
  shall prepare and submit the record of proceed-
  ings without delay.

  (3) The Board will track the progress of each
  custody appeal which is subject to an automatic
  stay in order to avoid unnecessary delays in
  completing the record for decision. Each order
  issued by the Board should identify the appeal
  as an automatic stay case. The Board shall noti-
  fy the parties in a timely manner of the date the
  automatic stay is scheduled to expire.

  (4) If the Board has not acted on the custody
  appeal, the automatic stay shall lapse 90 days
  after the filing of the notice of appeal.
  However, if the Board grants a motion by the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

8 C.F.R. § 1003.6

alien for an enlargement of the 21-day briefing schedule provided in § 1003.3(c), the Board's order shall also toll the 90-day period of the automatic stay for the same number of days.

(5) DHS may seek a discretionary stay pursuant to 8 CFR 1003.19(i)(1) to stay the immigration judge's order in the event the Board does not issue a decision on the custody appeal within the period of the automatic stay. DHS may submit a motion for discretionary stay at any time after the filing of its notice of appeal of the custody decision, and at a reasonable time before the expiration of the period of the automatic stay, and the motion may incorporate by reference the arguments presented in its brief in support of the need for continued detention of the alien during the pendency of the removal proceedings. If DHS has submitted such a motion and the Board is unable to resolve the custody appeal within the period of the automatic stay, the Board will issue an order granting or denying a motion for discretionary stay pending its decision on the custody appeal. The Board shall issue guidance to ensure prompt adjudication of motions for discretionary stays. If the Board fails to adjudicate a previously-filed stay motion by the end of the 90-day period, the stay will remain in effect (but not more than 30 days) during the time it takes for the Board to decide whether or not to grant a discretionary stay.

(d) If the Board authorizes an alien's release (on bond or otherwise), denies a motion for discretionary stay, or fails to act on a motion before the automatic stay period expires, the alien's release shall be automatically stayed for five business days. If, within that five-day period, the Secretary of Homeland Security or other designated official refers the custody case to the Attorney General pursuant to 8 CFR 1003.1(h)(1), the alien's release shall continue to be stayed pending the Attorney General's consideration of the case. The automatic stay will expire 15 business days after the case is referred to the Attorney General. DHS may submit a motion and proposed order for a discretionary stay in connection with referring the case to the Attorney General. For purposes of this paragraph and 8 CFR 1003.1(h)(1), decisions of the Board shall include those cases where the Board fails to act on a motion for discretionary stay. The Attorney General may order a discretionary stay pending the disposition of any custody case by the Attorney General or by the Board.

[36 FR 316, Jan. 9, 1971; 61 FR 18907, April 29, 1996; 61 FR 21065, May 9, 1996; 63 FR 27448, May 19, 1998; 68 FR 10350, March 5, 2003; 71 FR 57884, Oct. 2, 2006]

SOURCE: 52 FR 2936, 2941, Jan. 29, 1987; 57 FR 11570, April 6, 1992;  60 FR 29468, June 5, 1995; 61 FR 59305, Nov. 22, 1996; 63 FR 27448, May 19, 1998; 63 FR 31894, June 11, 1998; 64 FR 56141, Oct. 18, 1999; 66 FR 37123, July 17, 2001; 66 FR 54911, Oct. 31, 2001; 66 FR 56976, Nov. 14, 2001; 68 FR 9830, Feb. 28, 2003; 68 FR 9824, Feb. 28, 2003; 68 FR 9830, Feb. 28, 2003; 71 FR 57884, Oct. 2, 2006; 71 FR 70857, Dec. 7, 2006, unless otherwise noted.

AUTHORITY: 5 U.S.C. 301; 6 U.S.C. 521; 8 U.S.C. 1101, 1103, 1154, 1155, 1158, 1182, 1226, 1229, 1229a, 1229b, 1229c, 1231, 1254a, 1255, 1324d, 1330, 1361, 1362; 28 U.S.C. 509, 510, 1746; sec. 2 Reorg. Plan No. 2 of 1950; 3 CFR, 1949-1953 Comp., p. 1002; section 203 of Pub.L. 105-100, 111 Stat. 2196-200; sections 1506 and 1510 of Pub.L. 106-386, 114 Stat. 1527-29, 1531-32; section 1505 of Pub.L. 106-554, 114 Stat. 2763A-326 to -328.

8 C. F. R. § 1003.6, **8 CFR § 1003.6**

Current through February 21, 2008; 73 FR 9625

Copr. © 2008 Thomson/
West

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

8 C.F.R. § 1003.23

C

**Effective: [See Text Amendments]**

Code of Federal Regulations Currentness
    Title 8. Aliens and Nationality
        Chapter V. Executive Office for Immigration Review, Department of Justice (Refs & Annos)
            Subchapter A. General Provisions (Refs & Annos)
                ⌐☜ Part 1003. Executive Office for Immigration Review (Refs & Annos)
                    ⌐☜ Subpart C. Immigration Court--Rules of Procedure (Refs & Annos)

→**§ 1003.23 Reopening or reconsideration before the Immigration Court.**

(a) Pre-decision motions. Unless otherwise permitted by the Immigration Judge, motions submitted prior to the final order of an Immigration Judge shall be in writing and shall state, with particularity the grounds therefore, the relief sought, and the jurisdiction. The Immigration Judge may set and extend time limits for the making of motions and replies thereto. A motion shall be deemed unopposed unless timely response is made.

(b) Before the Immigration Court--

(1) In general. An Immigration Judge may upon his or her own motion at any time, or upon motion of the Service or the alien, reopen or reconsider any case in which he or she has made a decision, unless jurisdiction is vested with the Board of Immigration Appeals. Subject to the exceptions in this paragraph and paragraph (b)(4), a party may file only one motion to reconsider and one motion to reopen proceedings. A motion to reconsider must be filed within 30 days of the date of entry of a final administrative order of removal, deportation, or exclusion, or on or before July 31, 1996, whichever is later. A motion to reopen

must be filed within 90 days of the date of entry of a final administrative order of removal, deportation, or exclusion, or on or before September 30, 1996, whichever is later. A motion to reopen or to reconsider shall not be made by or on behalf of a person who is the subject of removal, deportation, or exclusion proceedings subsequent to his or her departure from the United States. Any departure from the United States, including the deportation or removal of a person who is the subject of exclusion, deportation, or removal proceedings, occurring after the filing of a motion to reopen or a motion to reconsider shall constitute a withdrawal of such motion. The time and numerical limitations set forth in this paragraph do not apply to motions by the Service in removal proceedings pursuant to section 240 of the Act. Nor shall such limitations apply to motions by the Service in exclusion or deportation proceedings, when the basis of the motion is fraud in the original proceeding or a crime that would support termination of asylum in accordance with § 1208.22(e) of this chapter.

(i) Form and contents of the motion. The motion shall be in writing and signed by the affected party or the attorney or representative of record, if any. The motion and any submission made in conjunction with it must be in English or accompanied by a certified English translation. Motions to reopen or reconsider shall state whether the validity of the exclusion, deportation, or removal order has been or is the subject of any judicial proceeding and, if so, the nature and date thereof, the court in which such proceeding took place or is pending, and its result or status. In any case in which an exclusion, deportation, or removal order is in effect, any motion to reopen or reconsider such order shall include a statement by or on behalf of the moving party declaring whether the subject of the order is also the subject of any pending crimin-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

8 C.F.R. § 1003.23

al proceeding under the Act, and, if so, the current status of that proceeding.

(ii) Filing. Motions to reopen or reconsider a decision of an Immigration Judge must be filed with the Immigration Court having administrative control over the Record of Proceeding. A motion to reopen or a motion to reconsider shall include a certificate showing service on the opposing party of the motion and all attachments. If the moving party is not the Service, service of the motion shall be made upon the Office of the District Counsel for the district in which the case was completed. If the moving party, other than the Service, is represented, a Form EOIR-28, Notice of Appearance as Attorney or Representative Before an Immigration Judge must be filed with the motion. The motion must be filed in duplicate with the Immigration Court, accompanied by a fee receipt.

(iii) Assignment to an Immigration Judge. If the Immigration Judge is unavailable or unable to adjudicate the motion to reopen or reconsider, the Chief Immigration Judge or his or her delegate shall reassign such motion to another Immigration Judge.

(iv) Replies to motions; decision. The Immigration Judge may set and extend time limits for replies to motions to reopen or reconsider. A motion shall be deemed unopposed unless timely response is made. The decision to grant or deny a motion to reopen or a motion to reconsider is within the discretion of the Immigration Judge.

(v) Stays. Except in cases involving in absentia orders, the filing of a motion to reopen or a motion to reconsider shall not stay the execution of any decision made in the case. Execution of such decision shall proceed unless a stay of execution is specifically granted by the Immigration Judge, the Board, or an authorized officer of the Service.

(2) Motion to reconsider. A motion to reconsider shall state the reasons for the motion by specifying the errors of fact or law in the Immigration Judge's prior decision and shall be supported by pertinent authority. Such motion may not seek reconsideration of a decision denying previous motion to reconsider.

(3) Motion to reopen. A motion to reopen proceedings shall state the new facts that will be proven at a hearing to be held if the motion is granted and shall be supported by affidavits and other evidentiary material. Any motion to reopen for the purpose of acting on an application for relief must be accompanied by the appropriate application for relief and all supporting documents. A motion to reopen will not be granted unless the Immigration Judge is satisfied that evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing. A motion to reopen for the purpose of providing the alien an opportunity to apply for any form of discretionary relief will not be granted if it appears that the alien's right to apply for such relief was fully explained to him or her by the Immigration Judge and an opportunity to apply therefore was afforded at the hearing, unless the relief is sought on the basis of circumstances that have arisen subsequent to the hearing. Pursuant to section 240A(d)(1) of the Act, a motion to reopen proceedings for consideration or further consideration of an application for relief under section 240A(a) (cancellation of removal for certain permanent residents) or 240A(b) (cancellation of removal and adjustment of status for certain nonpermanent residents) may be granted only if the alien demonstrates that he or she was statutorily eligible for such relief prior to the service of a notice to appear, or prior to the commission of an offense referred to in section 212(a)(2) of the Act that renders the alien inadmissible or removable under sections 237(a)(2) of the Act or (a)(4), whichever is earliest. The Immigra-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

8 C.F.R. § 1003.23

tion Judge has discretion to deny a motion to reopen even if the moving party has established a prima facie case for relief.

(4) Exceptions to filing deadlines--

(i) Asylum and withholding of removal. The time and numerical limitations set forth in paragraph (b)(1) of this section shall not apply if the basis of the motion is to apply for asylum under section 208 of the Act or withholding of removal under section 241(b)(3) of the Act or withholding of removal under the Convention Against Torture, and is based on changed country conditions arising in the country of nationality or the country to which removal has been ordered, if such evidence is material and was not available and could not have been discovered or presented at the previous proceeding. The filing of a motion to reopen under this section shall not automatically stay the removal of the alien. However, the alien may request a stay and, if granted by the Immigration Judge, the alien shall not be removed pending disposition of the motion by the Immigration Judge. If the original asylum application was denied based upon a finding that it was frivolous, then the alien is ineligible to file either a motion to reopen or reconsider, or for a stay of removal.

(ii) Order entered in absentia or removal proceedings. An order of removal entered in absentia or in removal proceedings pursuant to section 240(b)(5) of the Act may be rescinded only upon a motion to reopen filed within 180 days after the date of the order of removal, if the alien demonstrates that the failure to appear was because of exceptional circumstances as defined in section 240(e)(1) of the Act. An order entered in absentia pursuant to section 240(b)(5) may be rescinded upon a motion to reopen filed at any time if the alien demonstrates that he or she did not receive notice in accordance with sections 239(a)(1) or (2) of the Act, or the alien demonstrates that he or she was in Federal or state custody and the failure

to appear was through no fault of the alien. However, in accordance with section 240(b)(5)(B) of the Act, no written notice of a change in time or place of proceeding shall be required if the alien has failed to provide the address required under section 239(a)(1)(F) of the Act. The filing of a motion under this paragraph shall stay the removal of the alien pending disposition of the motion by the Immigration Judge. An alien may file only one motion pursuant to this paragraph.

(iii) Order entered in absentia in deportation or exclusion proceedings.

(A) An order entered in absentia in deportation proceedings may be rescinded only upon a motion to reopen filed:

(1) Within 180 days after the date of the order of deportation if the alien demonstrates that the failure to appear was because of exceptional circumstances beyond the control of the alien (e.g., serious illness of the alien or serious illness or death of an immediate relative of the alien, but not including less compelling circumstances); or

(2) At any time if the alien demonstrates that he or she did not receive notice or if the alien demonstrates that he or she was in federal or state custody and the failure to appear was through no fault of the alien.

(B) A motion to reopen exclusion hearings on the basis that the Immigration Judge improperly entered an order of exclusion in absentia must be supported by evidence that the alien had reasonable cause for his failure to appear.

(C) The filing of a motion to reopen under paragraph (b)(4)(iii)(A) of this section shall stay the deportation of the alien

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

8 C.F.R. § 1003.23

pending decision on the motion and the adjudication of any properly filed administrative appeal.

(D) The time and numerical limitations set forth in paragraph (b)(1) of this section shall not apply to a motion to reopen filed pursuant to the provisions of paragraph (b)(4)(iii)(A) of this section.

(iv) Jointly filed motions. The time and numerical limitations set forth in paragraph (b)(1) of this section shall not apply to a motion to reopen agreed upon by all parties and jointly filed.

[55 FR 30680, July 27, 1990; 57 FR 11571, April 6, 1992; 59 FR 1899, Jan. 13, 1994; 60 FR 34089, June 30, 1995; 61 FR 18907, April 29, 1996; 61 FR 19976, May 3, 1996; 61 FR 21228, May 9, 1996; 62 FR 10332, March 6, 1997; 62 FR 15362, April 1, 1997; 62 FR 17048, April 9, 1997; 64 FR 8487, Feb. 19, 1999; 68 FR 10350, March 5, 2003]

SOURCE: 52 FR 2936, 2941, Jan. 29, 1987; 52 FR 2936, Jan. 29, 1987;  57 FR 11570, April 6, 1992; 60 FR 29468, June 5, 1995; 61 FR 59305, Nov. 22, 1996; 63 FR 27448, May 19, 1998; 63 FR 31894, June 11, 1998; 64 FR 56141, Oct. 18, 1999; 66 FR 37123, July 17, 2001; 66 FR 54911, Oct. 31, 2001; 66 FR 56976, Nov. 14, 2001; 68 FR 9830, Feb. 28, 2003; 68 FR 9824, Feb. 28, 2003; 68 FR 9830, Feb. 28, 2003; 71 FR 57884, Oct. 2, 2006; 71 FR 70857, Dec. 7, 2006, unless otherwise noted.

AUTHORITY: 5 U.S.C. 301; 6 U.S.C. 521; 8 U.S.C. 1101, 1103, 1154, 1155, 1158, 1182, 1226, 1229, 1229a, 1229b, 1229c, 1231, 1254a, 1255, 1324d, 1330, 1361, 1362; 28 U.S.C. 509, 510, 1746; sec. 2 Reorg. Plan No. 2 of 1950; 3 CFR, 1949-1953 Comp., p. 1002; section 203 of Pub.L. 105-100, 111 Stat. 2196-200; sections 1506 and 1510 of Pub.L. 106-386, 114 Stat. 1527-29, 1531-32; section 1505 of Pub.L. 106-554, 114 Stat. 2763A-326 to -328.

8 C. F. R. § 1003.23, **8 CFR § 1003.23**

Current through February 21, 2008; 73 FR 9625

Copr. © 2008 Thomson/ West

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.